Estate of T. G. Hendrick, Deceased, Fort Worth National Bank, Independent Executor and Trustee v. Commissioner.
Estate of Hendrick v. Comm'r
Docket No. 19647. United States Tax Court
1950 Tax Ct. Memo LEXIS 149; 9 T.C.M. (CCH) 581; T.C.M. (RIA) 50169; July 7, 1950
*149 R. B. Cannon, Esq., 909-13 Sinclair Bldg., Fort Worth, Tex., for the petitioner. John W. Alexander, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency in the estate tax of petitioner in the sum of $58,344.77. The two issues for decision are these: (1) Did the $45,075 in United States War Savings Bonds which were registered in the name of Ida Hendrick constitute community property taxable to the estate of T. G. Hendrick, deceased; (2) did the Commissioner err in computing the life estate of decedent's wife in arriving at the value of annuities and trust payments as to which she was the annuitant and beneficiary, the reversionary interest therein under T. G. Hendrick's will belonging to certain educational and charitable institutions? A third issue, viz.: the amount of attorneys' fees deductible by petitioner, the parties agreed should be computed under Rule 50. Petitioner also alleged an overpayment of $64,743.34 in estate taxes. Findings of Fact T. G. Hendrick of Abilene, Texas, hereinafter called decedent, aged 83 years, died testate July 8, 1946. Upon probate of his will, the *150 Fort Worth National Bank duly qualified as Independent Executor and Trustee and filed an estate tax return with the collector of internal revenue for the second district of Texas. His surviving widow, Ida Hendrick, hereinafter called Ida, to whom he was married in 1882, died December 29, 1946, at the age of 81 years. Decedent's will was a joint and mutual will of himself and Ida, executed by them on January 22, 1929. "Item One" therein reads: "We first state that all of the property of every kind and character now owned as well as any that may hereafter be owned by us, or in which either of us may have an interest, is community property, earned by us since our marriage, and is owned one-half by each of us, whether the apparent title to such property or any item thereof is in the one or the other or in both of us. Having earned the property together we desire to dispose of it by joint will, in accordance with the terms hereof, and each of us hereby solemnly pledges his and her faith to the other that he or she will not alter or change or attempt to alter or change such disposition of the property, unless by proper instrument likewise jointly signed by us, and particularly that *151 the survivor of us will not make or attempt to make any change in such disposition." There were eleven codicils to the will, all executed on different dates, the first on March 17, 1931, and the last on October 10, 1945, none of which referred specifically to Item One. However, in the seventh codicil, dated December 12, 1936, in paragraph 9, it was stated that the will was designed to devise and bequeath "any and all property owned by us or either of us, both community property and individual property," following which it was stated that "this clause" was "supplementary" to other provisions of the will, it "being intended only to pick up any and all items of property that may not be otherwise disposed of." The community property of decedent and Ida consisted of both real and personal property, and at the time of his death its total value was $4,381,912. [1] They had no children and except for bequests to various relatives ranging in amounts from $10,000 to $25,000 each, aggregating about $225,000, all of their properties under the will went to named charities. These charities included a home for children, sanitarium and various religious activities of the Baptist Church and other *152 benevolences, and went directly or through trusts created by the will, the corpus of which was to be administered by the Fort Worth National Bank, which was named as trustee and independent executor without bond, and was given wide discretionary powers in the investment, operation and management of the estate and the trusts created thereunder, "the same as an absolute owner could do." The various codicils dealt mainly with changes affecting the different charities named in the will. In some instances the amounts of these were increased, decreased or revoked, and others substituted in lieu of those revoked, or new ones named and additional trusts created. Also, in some of the codicils the bequests to individual relatives were changed either in amount or revoked; in some instances it was recited that the amounts of the bequests had already been paid to the beneficiaries. Illustrative of this, and also as showing the reliance placed by decedent on "the books used by us with respect to the management of our property" in determining the property affected by the will, and also as evidencing the intention *153 of decedent that the recitals and the contents of "our books" should govern in the disposition of property affected by the will, there is set out below one of such codicils. [2]
No property other than a monthly income was left Ida, either in the original will or in any of the codicils. Under the "general theory" of the will as explained in the fifth codicil, if Ida should die first, then *154 decedent should be permitted to carry on and manage the joint properties until his death, at which time the trusts would be created and the other dispositions made as provided in the will, but if decedent died first, then Ida would thereafter "receive a certain income sufficient for her needs and be relieved of all worry and responsibility of managing the property" of $1,000 per month "or more up to $1,500 per month if requested by her." Prior to the fifth codicil, $1,000 per month was fixed as Ida's income after decedent's death, and in authorizing the optional increase to $1,500 per month said codicil also provided that the monthly payments to Ida should have priority in payment from a $500,000 trust fund then created and which provisions were never changed. Immediately preceding these provisions, the reason therefor was expressed as follows: "* * * our main purpose and desire, particularly of T. G. Hendrick, is, in the event he should die first, that Ida Hendrick should have the first call on the entire property with respect to receiving such certain and regular income therefrom during the balance of her life. Withth at in mind, and particularly in view of the disturbed financial *155 and business conditions since the will was written, we now stipulate and provide and will as follows: * * *" [Here follow provisions above mentioned] Ida acquired as owner eight United States War Savings Bonds, each bond as issued being registered in her name only, "Mrs. Ida Hendrick", and remained so registered, the date of purchase of each bond being the same month and year as appears in the "issued" column below, the cost of each of said bonds, the due date and the face amount thereof being as follows: Face
Series
Issued
Due
Cost
Amount
D
Aug. 1, 1939
Aug. 1, 1949
$7,500
$10,000
D
Mar. 1, 1940
Mar. 1, 1950
7,500
10,000
D
Jan. 1, 1941
Jan. 1, 1951
7,500
10,000
E
Jan. 1, 1942
Jan. 1, 1952
3,750
5,000
E
Jan. 1, 1943
Jan. 1, 1953
3,750
5,000
E
Jan. 1, 1944
Jan. 1, 1954
3,750
5,000
E
May 1, 1945
May 1, 1955
3,750
5,000
E
Jan. 1, 1946
Jan. 1, 1956
3,750
5,000 There was printed on the face of each bond the following: "This bond is not transferable and except as provided in said regulations, it is payable only to the registered owner." On July 8, 1946, said bonds belonged to Ida, being *156 her individual and separate property, and were then of the total value of $45,075. The first bond above listed was paid for by check drawn by Ida upon her individual bank account, but the payments for the purchase price of all of said bonds were from the community funds of decedent and Ida. Decedent purchased or caused to be purchased for Ida all of said bonds, and he directed that each bond as issued be registered in Ida's name only, so as to designate it as her individual and separate property, as he intended that it should be. It was the intention of decedent in purchasing said bonds and having them registered in Ida's name to make a gift to her of his one-half of the community funds expended in their purchase, and he did in fact make a gift to Ida of his one-half of all of the community funds expended in their purchase. Decedent kept and caused to be kept under his supervision and control a regular set of books [3] concerning all transactions relating to the community property belonging to him and Ida, and recorded therein were all of the assets owned and belonging to their community estate. When and as each of the bonds above listed was purchased for Ida and registered in her *157 name, the amount expended in purchasing such bond was charged direct to the investment account (capital account) in the community books as representing withdrawal of funds from the community estate, and the bonds, after their purchase, were not treated as belonging to the community estate of decedent and Ida. Thereafter the bonds belonging to Ida were recorded in separate ledger sheets, being removed and kept separate and apart from the books relating to the community estate. Furthermore, in 1944 and 1945, decedent had an audit made of his books and records covering a number of years, which audit reports he kept in his desk and used in the conduct of his business. In both of these audit reports the funds used to acquire the bonds purchased for and in the name of Ida were shown to have been withdrawn from the assets of the community estate and the net worth or capital account of the community estate reduced by the amount of such withdrawals. During the same years in which the bonds were purchased for and registered in Ida's name, decedent also bought 25 *158 other War Savings Bonds, the face value of which aggregated $500,000, but none of these was registered in Ida's name or purported to have been her property. One of the 25 bonds was registered in the name of "Ida Hendrick or T. G. Hendrick", but petitioner does not contend that this bond was Ida's separate property. Gift tax returns were filed by decedent covering the years 1939 to 1946, inclusive, and decedent did not report therein any and decedent did not report therein any gifts made by him to Ida during those years. In the estate tax return filed herein by petitioner, the bonds registered in Ida's name were included as a part of the community assets of decedent and Ida. Ida was 81 years of age when decedent died, and she had been in ill health and a weakened and impaired condition for many years. She was under the constant treatment of a physician from 1934 to the date of her death. She had anemia, chronic myocarditis, that is an impairment of her heart muscles, and other evidences of senility during the entire period of her treatment. Her condition did not improve, and in 1936 there was begun and continued for about eight years blood transfusions which were given at intervals *159 of one to three months, which tended to prolong her life. About a year and a half prior to her death, the blood transfusions had to be discontinued, since her condition became such that the transfusions were attended with considerable reaction, causing high fever. Her physician testified that at the time of decedents' death, Ida's life expectancy was from six months to one year. His testimony as to her life expectancy was corroborated by another physician. The life expectancy of Ida on the date of decedent's death was not greater than one year. The parties agreed that petitioner has incurred attorneys' fees which are deductible, and that the amount of same would be computed under Rule 50 or Rule 51, if they could not agree as to the amount. Opinion The claim that the bonds registered in Ida's name were her separate property was first made by petitioner in the petition initiating this proceeding. As we said in the recent case of (promulgated June 9, 1950) "it is fundamental that a taxpayer appealing to this Court may set up as a ground of appeal from a proposed additional assessment a right to a deduction which was not claimed in the original *160 return or at any hearing before the . If the bonds registered in Ida's name were her separate property, then they were not includible in decedent's estate and no estate tax is due thereon. If, on the other hand, as respondent contends, they were the community property of herself and husband, then they are includible and taxable. Whether the bonds were separate or community property, the laws of Texas must determine, since the parties resided there. In Texas all property purchased with community funds is presumed to be community property. It has been held, however, by the Supreme Court of that state, in , and followed and approved in later cases, [4] that when property is purchased with community funds and the deed thereto, by direction of the husband, is made to the wife, and there is sufficient evidence to show that he intended the property to be a gift to his wife, the presumption of title in the community is overcome and the property is the separate property of his wife. *161 The evidence and record as a whole sustain our finding that it was the intention of decedent to make a gift to Ida of his onehalf of the community funds expended in their purchase; that he did thereby make such gifts and the bonds thereby became her separate property at the time of the purchase of each. Ida and decedent both being dead at the time of the hearing, evidence to establish a gift and revealing decedent's intention necessarily rests upon circumstances, a number of which we have recited in our findings. These we think, when considered together, establish inescapably the conclusion reached. Chief among these was decedent's purchase of the bonds and having them registered exclusively in Ida's name, thus designating her as sole owner. She alone could collect them and they thereby became separate and apart from the community property owned by them. Strongly confirming this intention and separation of ownership were the books of decedent whereby the funds expended for the bonds and the bonds themselves were treated as not being a part of the community estate. The purchase of one bond each year for his wife, over a period of eight years, reflected that decedent intended that *162 as they matured Ida would receive in cash each year the face value of each bond, thus supplementing the annual bequest she was to receive under the will. This is in line with decedents' intention, expressed in the will, that he desired that Ida should "receive a certain income for each year and be relieved of all worry and responsibility of managing the property." That decedent also bought a half million dollars in War Savings Bonds during the same years, none of which he had registered in her name, and one of which for $50,000 he had registered in his or Ida's name, shows clearly his intention that these eight bonds, which alone were registered in Ida's name only, were to be her individual and separate property. We are not impressed with the argument that decedent failed to report a gift tax on the transactions for the years in which the bonds were purchased. The bonds were paid for with community funds, one-half of which already belonged to Ida, and her one-half would not be subject to a gift tax. . The husband's one-half of the amount paid for the purchase price of the bonds in each of said years was less than the amount excluded from *163 taxable gifts by the provisions of section 1003(b)(2) and (3) of the Code. The remaining question is whether, in valuing the charitable bequests, the life estate of Ida is to be determined with reference to established mortality tables, as was done by the respondent in his determination of the deficiency and as relied upon in his brief, or with reference to the actual physical condition of Ida at the time of her husband's death. Petitioner contends that in view of Ida's advanced age and the condition of her health, as testified to by her physician, that her reasonable life expectancy was not more than six months to one year from the date of decedent's death. Such was the testimony of her attending physician and that of another medical witness. She died within less than six months after her husband's death. In , and , we held that the actual physical condition of the life beneficiary on the date of decedent's death, rather than the use of established mortality tables, would control. We therefore hold that in determining the valuation of Ida's life estate, it should be based upon her life *164 expectancy of not more than one year. Amounts of attorneys' fees and over-payments will be computed under Rule 50. Decision will be entered under Rule 50. Footnotes
1. This does not include $45,075, the value of War Savings Bonds in question.↩
2. From fifth codicil, dated 4/19/34, Item "Second" reads: In Item Nine of our will we devised $10,000 to William Hendrick. Since that time we have made to him certain advances of money from time to time and may continue to do so at our discretion. Such advances heretofore made are shown on the books used by us with respect to the management of our property, and any future advances will be likewise entered therein. We now will that the aggregate of all such advances, without any interest being calculated thereon, shall be deducted from said $10,000 legacy to William Hendrick. Likewise, if we should hereafter make advances to any other devisee in our will or in any codicil thereto, then such advances as shown by our books shall be deducted from the amount so devised to such person or persons.↩
3. The same books referred to as "our books" in Item Second of the fifth codicil to the will, quoted in footnote 2 herein.↩
4. Among these: ; ; : $ ; see also 23 Tex. Juris. Par. 129.↩