David GRIMES, Executor of the Estate
of Jesse L. Grimes,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

No. 87–3080.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1988.

Decided July 13, 1988.

Merrick Hayes, Hayes, Schneider, Hammer, Miles & Cox, Bloomington, Ill., for petitioner-appellant.

Raymond W. Hepper, Appellate Section, Tax Div., Dept of Justice, Washington, D.C., for respondent-appellee.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Jesse and Ressie Grimes executed a joint and mutual will. Each spouse promised that the one surviving the longer would dispose of his or her interests in jointly-held property according to the terms of the will. The parties agree that under Illinois law such a document becomes irrevocable when either spouse dies, but they dispute its tax consequences. The Commissioner of Internal Revenue treated it as a taxable gift of property by the surviving spouse to the beneficiaries, effective on the date it

became irrevocable by virtue of Ressie's death; the Tax Court agreed. Jesse Grimes has since died, and his executor treats the contractual aspect of the will as hortatory and not a completed transfer. Opinions in this circuit have given each of these treatments to joint and mutual wills, depending on their terms. Compare *Estate of Lidbury v. CIR*, 800 F.2d 649 (7th Cir. 1986) (no gift), with *Pyle v. United States*, 766 F.2d 1141 (7th Cir.1985) (gift). Because the appropriate treatment depends on language unique to each will, we accept the Tax Court's characterization unless clearly wrong, which in this case it is not.

The portions of the will relevant to this appeal devise the Grimes' real property, held in joint tenancy. The will provided that the survivor would have a life interest in the other's portions of their real estate.[1] The devise required that the survivor pay taxes on the land, keep the buildings on the parcels insured, and apply any money collected on these policies to repair of the structures or to other improvements of the parcels. The joint will then describes the gift of both Jesse's and Ressie's interest in the parcels in fee simple to their children and grandchildren, subject to the life estate of the survivor.

Ressie died in April 1979. The Commissioner contends that, when Ressie died, Jesse, by way of his obligations under the joint will, completed a gift of a remainder interest in his half of the parcels to his children and grandchildren, the ultimate beneficiaries of the will.[2] Jesse petitioned the Tax Court to contest the assessment. His position was that under the will he had retained the right to consume the entire value of the property and therefore "made no taxable gifts during 1979." In late 1985 Jesse died. His estate was substituted as a party in this litigation. On cross-motions for summary judgment, the court found a 1979 gift tax deficiency of $160,136.60.

Section 2501(a)(1) of the Internal Revenue Code imposes a tax on any "transfer of property by gift". The transfer may be direct or indirect and the property "real or personal, tangible or intangible." 26 U.S.C. § 2511(a). Transfer by gift does not require donative intent, 26 C.F.R. § 25.2511–1(g)(1), but only that beneficial ownership be conveyed for less than full consideration. *Commissioner v. Wemyss*, 324 U.S. 303, 306, 65 S.Ct. 652, 654, 89 L.Ed. 958 (1945); 26 U.S.C. § 2512(b). A "gift" occurs only when "the donor has so parted with dominion and control as to leave in him no power to change its disposition". 26 C.F.R. § 25.2511–2(b). All agree that on Ressie's death, Jesse became legally obligated to convey his interest in the lands, along with Ressie's, according to the plan of the will. The plan called for the survivor to enjoy a life estate and to pass the property to children and grandchildren in fee simple on death. It is as if on the day Ressie died, Jesse gave all of his real property to his children and grandchildren, retaining a life estate—an event everyone agrees would have been a taxable gift by Jesse. Jesse counters with the observation that he retained the power to consume the entire value of the land. Illinois courts treat joint wills of this kind as reserving in the surviving spouse some right to consume the corpus of the bequest (and so destroy the remainder) when, for example, they encounter steep medical expenses. Since the remaindermen could not bank on receiving anything until they knew how much was still there on Jesse's death, the argument concludes, any "gift" took place only on Jesse's death, not Ressie's.

We rejected a similar argument in *Pyle*, which held that an arrangement of the sort into which Jesse and Ressie entered makes a gift taxable on the date of the first death. *Pyle*, and the Commissioner's position here, depends on a peculiarity of Illinois law. In most states the life tenant under a joint and mutual will has all but unlimited power

---

1. The operative text is: "We hereby give, devise and bequeath to each other respectively, for and during the term of the natural life of the survivor of us, all our respective interests in the real estate hereinafter described".

2. Ressie's interest passed directly to the beneficiaries and was taxable to her estate. The gift tax in question here was levied on the interest Jesse owned outright before Ressie's death.

to dispose of the property; the will is "irrevocable" only in the sense that the surviving spouse may not make another incorporating a different plan of distribution. Not so in Illinois, which treats the survivor as under an obligation to *preserve* the estate as well as to distribute what remains according to the will's directions. See, e.g., *Guhl v. Guhl*, 376 Ill. 100, 33 N.E.2d 185 (1941); *Gaston v. Hamilton*, 108 Ill.App.3d 1145, 64 Ill.Dec. 638, 642, 440 N.E.2d 190, 194 (5th Dist.1982). Joint wills permit the surviving spouse to invade the corpus only for limited purposes. See *Moline National Bank v. Flemming*, 91 Ill.App.3d 398, 405, 46 Ill.Dec. 883, 888, 414 N.E.2d 936, 941 (3d Dist.1980) (quoting 97 C.J.S. Wills § 1367(2)):

> Where an agreement as to mutual wills does not define the survivor's powers over the property, but merely provides as to the disposition of the property at his death, the survivor may use not only the income, but reasonable portions of the principal, for support and for ordinary expenditures, and he may change the form of the property by investment and the like; but he may not give away any considerable portion of it or do anything else with it that would be inconsistent with the spirit of the obvious intent and purpose of the agreement.

See also, e.g., *First United Presbyterian Church v. Christenson*, 64 Ill.2d 491, 1 Ill.Dec. 344, 356 N.E.2d 532 (1976); *Grubmeyer v. Mueller*, 385 Ill. 529, 53 N.E.2d 438 (1944); *Illinois Masonic Children's Home v. Flynn*, 109 Ill.App.3d 744, 65 Ill.Dec. 334, 441 N.E.2d 126 (5th Dist.1982).

Illinois presumes that the survivor's ability to treat with or dispose of the property is restricted unless the will clearly states otherwise. This is such a powerful presumption that we held in *Pyle* that even a conveyance in "fee simple" to the survivor under a joint will (with an obligation to reconvey on death) compelled the survivor to hold the property for the benefit of the ultimate recipients and thereby made an immediate gift of the value of the remain-

der interest. The grant in "fee simple" was limited by the subsequent paragraphs of the will specifying in detail the disposition that the couple desired of the property at the death of the survivor of them. The survivor's contractual obligations arising from the scheme of the joint will constrained her power to dispose of the property; she could invade the corpus only for "health, support, comfort and maintenance." *Id.* at 1144. Because joint and mutual wills are contracts, the spouses may elect a different approach.

In *Lidbury* the will allowed the survivor to consume the entire estate without regard for the remaindermen by exempting the survivor from liability for waste. That, we said, meant that it was impossible to value what would fall into the hands of the remaindermen. The upshot in *Lidbury:* no gift. The will in this case, though, does nothing to alter the presumptive rule in Illinois that the survivor's ability to invade the principal is limited by his contractual commitment to the testamentary plan.[3] Indeed, it reinforces the presumption because it contains limits of its own. Jesse was required to pay taxes on the parcels, keep them insured for their fair value, and direct any proceeds from insurance back into the parcels. These are not the provisions of a will giving the survivor the unfettered right to dispose of the property. The will imposes constraints on alienation more onerous than those Illinois would imply; it even prevents the survivor from changing the form of the assets. Whatever power Jesse retained to consume the value of the lands after Ressie's death, it was substantially less than absolute. The constraints on Jesse's power to consume the value of the lands became property interests in the hands of the remaindermen when Jesse lost the absolute power of disposition. *Christenson*, 64 Ill.2d at 497, 1 Ill.Dec. at 346, 53 N.E.2d at 535 (third party beneficiaries of a joint will can sue to limit surviving joint tenant's disposition of the property);

---

**3.** We do not consider the extrinsic evidence offered by Jesse. Illinois law is clear that the intentions of testators must be drawn from the four corners of the will. *Edgar County Children's Home v. Beltranena*, 402 Ill. 385, 387, 84 N.E.2d 363, 365 (1949).

*Freese v. Freese,* 49 Ill.App.3d 1041, 7 Ill. Dec. 692, 364 N.E.2d 983 (4th Dist.1977).

As we have said, the interests in the remaindermen were less than those held in ordinary life tenancies because Jesse had a limited right to invade the corpus. The Commissioner calculated the amount of Jesse's gift tax by assuming that he had conveyed a full remainder. See 26 C.F.R. § 25–2512–9(d) & Table A(1). Jesse's reply brief takes issue with this approach but comes too late. His petition to the Tax Court, like the arguments in his opening brief before us, addressed only the question whether he made *any* gift. He did. If he wished to contest the method used to evaluate the worth of the gift, he had to raise that issue in the Tax Court.

Jesse also complains about the award of interest on the gift tax, which has been outstanding since 1979. He asserts, and the Commissioner denies, that the principal and interest due on the gift tax now exceed the value of this portion of his estate. The size of the interest obligation is attributable to the long delay in paying this tax and the high rates of interest throughout this time. See 26 U.S.C. § 6621. A court of appeals is not entitled to alter either the tax or the interest on equitable grounds. *CIR v. McCoy,* —— U.S. ——, 108 S.Ct. 217, 98 L.Ed.2d 2 (1987). Interest is simply compensation for the time value of money. Jesse retained (and could have invested) the $160,000 he should have paid to the tax collector in 1979, which would or could have produced a sum large enough to pay the tax with interest in 1988. Still, concern about the accumulation of interest—and the treatment of the gift tax in relation to the estate tax—led us to wonder whether in *Pyle* we had fully appreciated all of the considerations that might influence the character-

ization of the joint and mutual will as a gift rather than a testamentary transfer. We therefore asked for supplemental memoranda discussing the way in which the estate tax is computed and the gift tax credited against it.

Under § 2036(a) of the Code, the fair market value of the property is included in Jesse's gross estate even though he earlier gave away the remainder interest. The statute pulls back into the estate all property transferred in this manner in order to ensure a transfer tax on the whole value of the property (the life estate plus the value remaining at death). The gift during life is a will substitute. To prevent double taxation of the property interest on which gift tax has been paid, the Code reduces the estate tax by the proportion that the value of the gift has to the current value of the gross estate.[4] 26 U.S.C. §§ 2001(b), 2012(a). The Commissioner's memorandum represents that "assuming arguendo that the fair market value of the property and the unified estate and gift tax rates remained constant, the actual estate tax would be imposed only upon the value of the retained life estate." Jesse concedes that § 2001 affords relief from double transfer taxes in such a case but takes issue with its assumptions. He observes, and the Commissioner agrees, that if the property increases in value from the time of the gift, the increase will be taxed in the estate. Jesse's complaint is that if the value of the property declines after the time of the gift, the IRS need not refund any money. The Commissioner may read the Code differently, but § 2012(a) seems to support Jesse's position.[5] Such heads-I-win-tails-you-lose systems are common in taxation (for example, losses are deductible only against profits, and carrybacks and

---

4. The adjustment does not give as a credit the exact amount of gift tax paid. It treats as paid the amount that would have been paid had the current rate schedule been in effect at the time the gift was made. 26 U.S.C. § 2001(b)(2). Fluctuations in the value of the property transferred by gift, like changes in the rate schedule, also may result in the credit varying from the gift tax assessed.

5. "[T]he amount of [the estate tax] credit shall not exceed an amount which bears the same ratio to the tax imposed by section 2001 ... as the value (at the time of the gift or at the time of the death, *whichever is lower*) of so much of the property which constituted the gift as is included in the gross estate bears to the value of the entire gross estate ..." 26 U.S.C. § 2012 (emphasis added).

carryforwards are limited); express gifts with retained life estates are treated no worse than the kind of gift implied from joint and mutual wills. Taxpayers' inability to claw back money if property declines in value does not persuade us that there is a problem in the logic of *Pyle*.

More troubling, however, is the way the time value of money affects the gift tax credit. To discount the remainder interest to present value in order to determine the amount of the gift, the Commissioner essentially asks: what amount today, if invested at ordinary rates of interest, would yield the full value that the property will have at death? 26 C.F.R. § 25.2512–9. Cf. *Continental Illinois National Bank and Trust Co. v. United States*, 504 F.2d 586 (7th Cir.1974). To collect the gift tax on a sum determined this way is to collect a tax that, if held and invested until death, should just equal the estate tax—assuming that gift and estate taxes have the same rate and that the property does not change in value unexpectedly. If computations are done right, the gift tax should have the same present value as the estate tax on the whole property. That becomes clear in a case like this in which the Commissioner wants to collect the gift tax plus interest, a sum that may exceed the estate tax. Of course the gift tax is computed on the basis of the donor's expected life span; like appreciation in value, differences between the anticipated and the actual may affect the tax treatment. But when everything matches up—as it will over thousands of taxpayers, although not necessarily any given taxpayer—the gift and estate taxes should be equal, so that payment of the one makes payment of the other unnecessary unless the property appreciates in value. Only that appreciation should be taxed to the estate.

The Commissioner's supplemental filing takes a different approach. In the Commissioner's eyes, gift tax covers only a portion of the value of the property. To take a simple example, let us suppose real property is worth $1 million when a remainder is given away in 1975, the donor's life expectancy is 10 years, and the discount rate is 7.17%; then the value of the remainder interest is $500,000 (disregarding any chance that the donor would invade the principal). The donor would be required to pay a gift tax on this amount: say, to keep things simple, $100,000, a rate of 20%. The Commissioner treats this as paying tax on half of the value of the property. If the donor lives exactly 10 years and dies in 1985, when the property is still worth $1 million and the rate of tax still 20%, the estate will be taxed $200,000; the credit for the gift tax will be $100,000; the net payment will be $100,000. This tax falls on what the Commissioner's memorandum calls "the value of the retained life estate". (It also would fall on any increase in value, but we disregard that possibility to make things simple. So, too, we disregard the fact that the taxes are progressive, 26 C.F.R. § 20.2001–1, which magnifies the effect we described.)

It should be apparent, however, that the estate does not contain a "retained life estate" to be taxed; a life estate is worthless at death. It contains (by attribution) only the value of the real property. That property had been given away years before —and fully taxed on that event. If there had never been a gift, the estate tax due in 1985 would have been $200,000 in 1985 dollars. Because of the gift in 1975, the IRS received $100,000 in 1975 dollars— which, given the 7.17% rate of interest, *is identical to $200,000 in 1985 dollars.*[6] That is the amount either the Commissioner or the taxpayer could have produced by investing $100,000 in 1975 and reinvesting all interest until 1985. To levy a gift tax of $100,000 in 1975, and a net estate tax of $100,000 in 1985, is to collect on the one parcel a full tax of $300,000 in 1985 dollars. Why? The taxpayer did not become wealthier by making the gift in 1975; in either case he used the property during his life, and his children received it on his death. To believe, as the Commissioner apparently

---

6. Something made clear in Jesse Grimes's case because the Commissioner wants to collect, in 1985, about twice the principal of the tax that would have been due in 1979. (Note that in all of these computations we disregard income taxes payable on interest.)

does, that the gift in 1975 created a "life estate" that could be taxed at death is to conjure property out of thin air.

It would be more accurate to say that the estate tax computed in the way we have described falls on the implicit rental value of the property during the time between gift and death. The donor has the use of the property during life, a use worth in each year approximately the market value of the property ($1 million) times the annual rate of return on capital (7% in this example); if he had rented the property instead of holding it as a life tenant, he would have had to pay the landlord at least this amount. Rent not paid is a source of value; the life tenant is better off by that amount than an identically-situated person who must pay such rent. Many people believe that the implicit rental value of real property should be taxed to its owner. Our tax system does not include this value as an element of income, however, so it is strange to see this item taxed as a wealth interest at death—stranger still that this source of value should be taxed if and only if the remainder interest is given away during life. To treat imputed income as an element subject to death taxes creates problems of its own, because rent not paid is left in the estate and taxed as wealth explicitly; to tax it separately as a "life estate" is to tax it twice. Whatever the appropriate treatment of imputed rental value, a death tax is off the mark. Gift and estate taxes are transfer taxes; a donor-testator such as Jesse Grimes makes one full transfer of the property whether in one stage (at death) or two stages (gift followed by death); the economic effect of the one- and two-stage transfers is the same, yet they may produce substantially different tax consequences.

Perhaps we overlook something in the Code that resolves this difficulty—though if we missed it, so did the Commissioner's supplemental memorandum. The prospect of increased transfer taxation just because the transfer took place in two steps—whether called taxation of imputed income, double taxation, or simply disregarding the time value of money on the gift tax—is troubling. The world of taxation is full of cases in which economically-identical things receive different tax treatment because done in a different form, e.g., *Howell v. United States*, 775 F.2d 887 (7th Cir.1985), so a donor who goes into this with his eyes open can hardly complain. Jesse Grimes, however, did not think he was making a gift in 1979. The treatment of transfers under joint and mutual wills as gifts is an artifact of an unusual rule of common law in Illinois, and we suspect that neither the attorneys who draft these wills nor the couples who execute them understand their tax consequences.

So far as the Code is concerned we are required to call the transfer accomplished by a joint and mutual will a "gift" despite this lack of awareness. And the difficulty we have sketched is not a source of inequitable treatment in the computation of the *gift* tax, or the collection of interest on overdue gift tax. It is a source of inequitable treatment in the computation of the *estate* tax. Crediting the interest on the gift tax (actual or imputed) against the estate tax would be one solution, for such a credit would state both taxes in the value of money as of the time of death. Treating the gift tax as full payment of transfer tax obligations on the land's value at the time of the gift, thus limiting the estate tax to changes in the value of the real property thereafter, would be another. Perhaps some obscure provision of the Code does just this; perhaps not. In either event, our unease about the way in which gift taxes are credited against estate taxes is not a reason to decline to enforce the gift tax. Jesse's estate did not present to the Tax Court (or to us) any of the considerations that we have found troubling. Maybe these problems will vanish when the Commissioner and the Grimes estate work out the estate tax obligations. If they do not, this subject belongs on the legislative agenda.

AFFIRMED.