T.C. Memo. 1998-216

UNITED STATES TAX COURT

ESTATE OF SUZANNE W. CULLISON, DECEASED, J. GREG CULLISON,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11573-96.                          Filed June 17, 1998.

<u>James Powers</u>, for petitioner.

<u>Rick V. Hosler</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined a deficiency in Federal
gift tax against petitioner for 1989 of $559,435 and a deficiency
in Federal estate tax of $506,298.

After concessions, the issues for decision are:

(1) Whether Suzanne W. Cullison (decedent) transferred four parcels of farmland totaling approximately 530 acres to her grandchildren in late 1988, rather than on August 29, 1989. We hold the transfer occurred on August 29, 1989.

(2) The fair market value of the farmland, as of the date of its transfer by decedent to her grandchildren. We find it was $1,865,500.

(3) The value of the private annuity the grandchildren agreed to pay decedent in exchange for the farmland. We find it was $1,360,724.

(4) Whether the private annuity transaction qualifies as a transaction in the ordinary course of business under section 25.2512-8, Gift Tax Regs. We hold that it does not.

All section references are to the Internal Revenue Code in effect either at the date of transfer or the date of decedent's death (whichever is applicable), and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91 and are found accordingly. We incorporate the parties' stipulations in this opinion by reference.

Decedent, a resident of Phoenix, Arizona, died on January 19, 1992. Decedent was survived by her son and only child Jerry Cullison (Jerry) and her four grandchildren, J. Gregory Cullison (Greg), Janet L. O'Mara (Janet), Kimberly Ann Cullison (Kimberly), and Lori Ann Cullison (Lori). Greg and Janet are the children of Jerry and his first wife; Lori is Jerry's daughter by his second wife; and Kimberly is his daughter by his third wife. When the petition herein was filed, Greg, the personal representative of decedent's estate, resided in Arizona.

Since the 1960's, decedent had owned four parcels of farmland totaling approximately 530 acres outside Wellton, Arizona, a farming community in Yuma County. Each parcel is situated in the Wellton-Mohawk Drainage District and receives water from the Colorado River for irrigation. Decedent and her then husband (who had been a professor in the agricultural education department of Arizona University and later served as the State of Arizona's director of agricultural education) had started acquiring farmland in the Wellton area about 1951, shortly before water from the Colorado River was first provided to the area upon the Wellton-Mohawk drainage project's completion. The four parcels of farmland involved in the instant case were acquired by decedent and her husband at various times during the 1960's. Following their divorce in 1974, decedent became the sole owner of the four parcels.

Although her family has been farming in the Wellton area since 1952, both decedent and her husband, before and after their divorce, had continued to reside for most of the year in Phoenix. Decedent's husband hired individuals to farm some of their land, and he and decedent also rented out some of their farmland. In 1959, shortly after his graduation from college, Jerry moved to Wellton to farm some of their land full time. At some point, a family partnership among decedent, her husband, and their son was established to farm this land. After the divorce in 1974, Jerry continued to farm some of the four parcels of land in issue, pursuant to a family partnership arrangement he had with decedent. In addition, Jerry eventually acquired farmland of his own in the Wellton area.

Later, shortly after his graduation from college in about 1985, Greg joined Jerry in his Wellton farming operations for 6 to 12 months. By 1988, Greg had moved to Wellton to farm full time.

Originally, decedent had planned to leave a larger portion of her estate in her will to her grandchildren Greg and Janet than she planned to leave to her two other grandchildren, Kimberly and Lori. She felt closer to Greg and Janet because she had cared for them for 18 months following their mother's death. Decedent's last will and testament, a holographic will which she executed on June 19, 1984, reflects her testamentary plan for

this unequal disposition of her estate among her four grandchildren. With respect to the four parcels of farmland involved in the instant case, the will generally provided that two of the parcels would be given to Greg, one parcel would be given to Janet, and one parcel would be given to Lori. In the will decedent further stated that she expected "any land to remain in the family. If any heir wishes to sell his or her land, the other heirs are to be given an option to buy it at current market price."

Ultimately, the above holographic will provisions concerning the four parcels never became operative because of certain discussions that took place between Jerry and decedent. In their discussions sometime after decedent's execution of the June 19, 1984, holographic will, Jerry persuaded her to treat her grandchildren, Greg, Janet, Kimberly, and Lori, equally. Jerry told decedent that if she implemented her testamentary plan to treat the grandchildren unequally, he would remedy any disparity by leaving more of his own property to those who received less from her.

As a result of his first wife's death in the early 1960's, Jerry became acquainted with Steve Shadle, an attorney practicing in Yuma County who specializes in estate work and estate planning. Over the years, Mr. Shadle had also performed occasional legal work for decedent and her former husband.

In early 1987, decedent consulted with Mr. Shadle and Vince Schulte (a certified public accountant practicing in Yuma County who previously had done some accounting and tax work for the family). Decedent had been considering selling her four parcels of farmland to her grandchildren on an installment basis. During his meeting with decedent, Jerry, and Mr. Schulte, Mr. Shadle raised and further discussed with them the alternative possibility of decedent's selling the four parcels to her grandchildren in exchange for a private annuity.

Although decedent initially had been contemplating selling a separate parcel to each grandchild, she was concerned that one or more of them might later decide to sell their land to outside parties. Of decedent's grandchildren, only Greg intended to farm the four parcels. Decedent thus also indicated to Mr. Shadle that she wanted those of her grandchildren still keeping their parcels to have an option to purchase the land of any grandchild wanting to sell.

Mr. Shadle then proposed to decedent that (1) the four parcels be sold by decedent to her four grandchildren jointly in exchange for a private annuity from them, but (2) the land immediately be contributed to a family partnership the grandchildren would establish to manage and farm the land. Under this proposed family partnership agreement, the grandchildren would each be granted reciprocal rights to purchase the

partnership's land in the event the partnership terminated.

During 1988, decedent advised Mr. Shadle that she wished to proceed with the above plan. She further instructed him to tell her grandchildren that her sale of the four parcels to them would be conditioned upon their agreeing to contribute the land to the family partnership Mr. Shadle would help them organize and establish.

In connection with helping decedent to effectuate the private annuity transaction, Mr. Shadle needed to obtain valuations of (1) the four parcels decedent would sell to her grandchildren and (2) the private annuity the grandchildren would promise to pay her in exchange for the land. As an experienced estate planner, Mr. Shadle believed that there should be no potential Federal estate and gift tax liabilities on decedent's part from the private annuity transaction if the value of the private annuity decedent received equaled the value of the land she transferred to her grandchildren. Before advising decedent with respect to the private annuity transaction in issue, Mr. Shadle had helped other clients to arrange between 5 and 10 private annuity transactions. These earlier private annuity transactions mostly involved certain ranch properties. In these earlier transactions, either a Big Six accounting firm or the client's accountant had determined the annual payment to be made under each of the private annuities.

As Jerry was familiar with decedent's land and knowledgeable about farmland prices in the Wellton area, he helped her and Mr. Shadle to value each of her four parcels. In valuing decedent's land, Jerry further considered detailed information on recent sales of farmland in the area which he obtained from a title company. Jerry concluded that decedent's four parcels had a total combined market value of $1,865,500.

As a result, Mr. Shadle knew that, if decedent were to avoid potential Federal estate and gift tax liabilities in connection with the private annuity transaction, the private annuity payable to her should also have a value of $1,865,500. He provided this information to Mr. Schulte, decedent's accountant, since Mr. Schulte would determine the annual payment the grandchildren should make to decedent under the private annuity.

On the basis of certain information contained in Table V of section 1.72-9, Income Tax Regs.,[1] Mr. Schulte concluded that a person decedent's age of about 81 years in late 1988 would have a

_____

[1] Although Mr. Schulte testified he used Table V in sec. 1.72-5, Income Tax Regs., he apparently meant and was referring to Table V in sec. 1.72-9, Income Tax Regs., as there is no Table V in sec. 1.72-5, Income Tax Regs. It is further to be noted that Table V and other similar tables in sec. 1.72-9, Income Tax Regs., are used in determining the exclusion ratio specified in sec. 72(b). In general, this exclusion ratio is applied for Federal income tax purposes in determining the portion of an annuity payment excludable from a taxpayer's gross income as a nontaxable return of the taxpayer's investment in the annuity contract. See generally sec. 72(b); sec. 1.72-4(a), Income Tax Regs. Table V thus is not directly applicable to the valuation of annuities for Federal estate and gift tax purposes.

life expectancy of 8.9 years.  Mr. Schulte further concluded that it would be appropriate to use a 9-percent interest rate factor in connection with the private annuity arrangement involving decedent, as he believed 9 percent to be a slightly higher interest rate than the prevailing interest rate currently charged on land sale contracts in Arizona.  He then consulted a loan amortization table to learn what annual loan payment would have to be made to amortize over 8.9 years a $1,865,500 loan paying 9-percent interest per annum.  The amortization table he consulted, however, provided no information with respect to a loan for an 8.9-year term.  As a result, Mr. Schulte examined the information the table provided concerning a similar 9-year-term loan.  From that information, he computed that an annual loan payment of $311,165 would be required to amortize a $1,865,500 loan over 9 years.  Mr. Schulte thus concluded and advised Mr. Shadle that $311,165 should be the annual payment made to decedent by her grandchildren under the private annuity.

Decedent, Greg, Janet, Kimberly, and Lori entered into an annuity agreement pursuant to which decedent would convey to each grandchild an undivided one-fourth interest in her four parcels of farmland, in exchange for the four grandchildren's agreeing to pay $311,165 to decedent on September 1 of each year during her life, beginning September 1, 1990.  This annuity agreement, which had been drafted by Mr. Shadle, states that the agreement was

being entered into by decedent, Greg, Janet, Kimberly, and Lori on August 29, 1989. The agreement further states that all of the parties thereto agreed that the fair market value of decedent's land was $1,865,500.

Decedent signed the annuity agreement on December 23, 1988, with her signature to the document being acknowledged before a notary public on that same date. Her grandchildren's respective signatures to the annuity agreement are stated to have been acknowledged by them to Mr. Shadle, acting as a notary public, on August 29, 1989.

Mr. Schulte had performed similar work in connection with the creation and establishment of private annuities by two other clients. During his engagement by decedent, however, Mr. Schulte was not aware of the recent enactment of section 7520, whose provisions concerning the valuation of private annuities would be effective for transactions occurring after April 30, 1989. Although Mr. Schulte subscribed to and received a weekly Federal income tax service, he did not subscribe to a Federal estate and gift tax service.

The annuity agreement provided that decedent would transfer to the grandchildren all of her interest in the four parcels by warranty deed and that decedent would have no further interest in the land after the August 29, 1989, date of the annuity agreement and decedent's delivery of the warranty deed to the

grandchildren. The annuity agreement further provided that the land decedent transferred would not be security for the annuity payments due from the grandchildren to decedent. The agreement also provided that each grandchild's undivided one-fourth interest in the four parcels was to be that grandchild's sole and separate property.

On August 29, 1989, decedent by warranty deed conveyed to each of her grandchildren an undivided one-fourth interest in the four parcels. The warranty deed was executed by decedent on August 29, 1989, and was recorded by the grandchildren on September 8, 1989.

Decedent's four grandchildren entered into their Cullison Enterprises partnership agreement (partnership agreement) on August 29, 1989. The partnership agreement provided that the partnership would commence on August 29, 1989. The partnership's stated purpose was to own, manage, or perform work on any farms or agricultural lands. The partnership agreement restricted the partners' ability to sell their interests in the partnership to third parties. In addition, upon the partnership's liquidation, any partner would have the right to bid on the partnership's assets, and the bid would have to be accepted unless an outsider's bid on the assets was at least 20 percent higher.

On August 29, 1989, Janet's husband executed a Consent of Spouse, pursuant to which he agreed to abide by the terms of the partnership agreement.

On August 30, 1989, decedent's grandchildren by warranty deed conveyed to their Cullison Enterprises partnership the land decedent had transferred to them. This warranty deed, which had been executed by them on August 30, 1989, was recorded by them on September 8, 1989.

From late 1988 until August 29, 1989, decedent continued to be the land's sole owner. Decedent was entitled to the rents payable by tenants for their use of the land until that date, and she was also liable for any real property taxes imposed covering the period of her ownership up until that date.

From September 1, 1990, through January 19, 1992, decedent's grandchildren never made any of the annual payments they owed to decedent pursuant to the annuity agreement.

Decedent died on January 19, 1992, when she was 84 years and 2 months old. Neither decedent nor petitioner ever filed any Federal gift tax returns.

During the examination of petitioner's estate tax return, the Internal Revenue Service (IRS) estate tax examiner asked Mr. Shadle (who was petitioner's attorney) to obtain and provide him with an appraisal report concerning the value of the land decedent had transferred to her grandchildren. As a result, Mr.

Shadle retained the services of a qualified real estate appraiser in Yuma County and directed him to value the land as of August 29, 1989, because that was the effective date of the annuity agreement. In his report, dated October 10, 1994, this appraiser concluded that the land had a fair market value of $1,945,925 as of August 29, 1989.

In the notice of deficiency dated March 13, 1996, respondent, among other things, determined that decedent's transfer of the land was a gift subject to gift tax. The March 13, 1996, notice of deficiency stated, in pertinent part:

Gift of Real Property in Yuma County, AZ

Your transfer of Yuma County, Arizona Real Property with a value of $1,945,925 to Kimberly Ann Cullison, Janet L. O'Mara, J. Gregory Cullison and Lori Ann Cullison was a gift for Federal gift tax purposes. Accordingly, your total gifts for 1989 are increased by $1,945,925.[2]

Alternatively, if it is determined that your transfer of the Yuma County, Arizona, real property was a bona fide transfer in exchange for a private lifetime annuity, then the excess of the fair market value of the real property transferred over the present value of the annuity constitutes a gift for Federal gift tax purposes. The value of the gift is computed as follows:

| | |
|---|---|
| Fair Market Value of Yuma Co. real property | $1,945,925 |
| Present Value of Private lifetime annuity | 1,360,724 |
| Value of Gift | 585,201 |

_____

[2] Respondent no longer contends that the entire transfer was a gift. See infra note 3.

In the notice of deficiency dated March 21, 1996, respondent determined, among other things, that in calculating petitioner's estate tax liability, adjusted taxable gifts should be increased as a result of decedent's 1989 gift of land to her grandchildren.

In its petition seeking review of the above two notices of deficiency, petitioner maintained that decedent had transferred the land to her grandchildren on or about August 29, 1989. The petition alleged, in pertinent part:

5. Facts upon which Petitioner relies, as the basis of Petitioner's case, are as follows:

* * * * * * *

b. On or about August 29, 1989, the Decedent, being then a single woman, entered into an agreement with her four grandchildren pursuant to which she transferred to them farming property of substantial value.

c. In consideration of the foregoing transfer of ownership, the four children contemporaneously agreed to pay, on the first day of September beginning with the year 1990, an annuity payment of $311,165 for as long as Decedent might live.

d. The transfer of real estate was a transfer for full and adequate consideration and was not a taxable gift.

OPINION

Section 2001(a) imposes an estate tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. The tax imposed is equal to the excess of the tentative tax on the sum of the amount of the taxable estate and the amount of adjusted taxable gifts, over the amount of tax which would have been payable as a gift tax with respect to gifts made by a decedent after December 31, 1976. Sec. 2001(b). The term "adjusted taxable gifts" means the total amount of taxable gifts (within the meaning of section 2503) made by a decedent after December 31, 1976, other than gifts which are included in the gross estate of the decedent. Sec. 2001(b). Section 2503(a) defines "taxable gifts" as the total amount of gifts made during a calendar year, less certain statutory deductions. Thus, decedent's transfer of her farmland constitutes an adjusted taxable gift within the meaning of section 2001 only if it is also a taxable gift within the meaning of section 2503. See Estate of DiMarco v. Commissioner, 87 T.C. 653, 656-657 (1986).

Section 2501 imposes a tax on property transferred by gift. Sec. 2501(a); see also sec. 2511(a). If property is transferred for less than adequate and full consideration in money or money's worth, the amount by which the value of the property exceeds the value of the consideration is deemed a gift. Sec. 2512(b); Commissioner v. Wemyss, 324 U.S. 303, 306-307 (1945). In

Commissioner v. Wemyss, supra at 306-307, the Supreme Court interpreted section 2512 as dispensing with the test of "donative intent" in favor of a "much more workable external test" that "where 'property is transferred for less than an adequate and full consideration'", then the excess "'shall, for  * * *  [the purpose of gift tax] be deemed a gift'".  Thus, the Federal gift tax provisions reach further than the common law concept of gifts and embrace sales and other exchanges of property where the value of the property transferred exceeds the value of the consideration received.  Sec. 25.2512-8, Gift Tax Regs.  As a result, in determining whether the private annuity transaction in the instant case is subject to gift tax, we must determine the value of decedent's land and the value of the private annuity (i.e., the consideration decedent received).[3]

Transfers of property in the ordinary course of business, however, are not subject to gift tax.  Sec. 25.2512-8, Gift Tax Regs.  To qualify, the transaction must be bona fide, at arm's length, and free from donative intent.  Id.; see Harwood v. Commissioner, 82 T.C. 239, 257-258 (1984), affd. without

_____

[3]  Respondent no longer contends (as was originally determined in the Mar. 13, 1996, notice of deficiency) that no private annuity, in fact, was payable to decedent.  On its estate tax return, petitioner included in decedent's gross estate the two outstanding annuity payments owed to decedent by her grandchildren.  The parties have now further stipulated that the gross estate is to be increased by an additional $46,072 to reflect the accrued interest owed on these annuity payments.

published opinion 786 F.2d 1174 (9th Cir. 1986); see also Carson v. Commissioner, 641 F.2d 864, 866 (10th Cir. 1981), affg. 71 T.C. 252 (1978).  As we further noted in Harwood v. Commissioner, supra at 258:  "Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift."

Section 7520 generally requires (with certain exceptions not applicable here) the value of any annuity, interest for life or term of years, remainder, or reversionary interest to be determined under tables or formulas prescribed by the Secretary in regulations thereunder.  Each such valuation under section 7520 is to consist of (1) an interest rate component (rounded to the nearest .2 percent) equal to 120 percent of the Federal midterm rate in effect under section 1274(d)(1) for the month in which the valuation date falls and (2) a mortality component, reflecting the most recent mortality data from the U.S. census (updated every 10 years).  Sec. 7520(a)(1) and (2), (c)(1), (3); sec. 20.7520-1(c), (b)(1)(i), (2), Estate Tax Regs.; sec. 25.7520-1(c), (b)(1)(i), (2), Gift Tax Regs.

Section 7520[4] (which was enacted on November 10, 1988, as part of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 5031(a), 102 Stat. 3342, 3368) is effective for transactions with valuation dates after April 30, 1989.  TAMRA sec. 5031(c), 102 Stat. 3369.  Generally, the valuation date for gift tax purposes is the date upon which the gift is made.  Sec. 25.7520-1(b)(1)(ii), Gift Tax Regs.

In the instant case, petitioner contends that the private annuity payable to decedent is not to be valued under section 7520, because the private annuity transaction occurred before the May 1, 1989, effective date of section 7520.  Petitioner maintains that the transaction took place in late 1988, when the

---

[4]  Before the enactment of sec. 7520, the estate and gift tax regulations long had contained actuarial tables to assist in the computation of the fair market value of annuities, life estates, terms for years, remainders, and reversions.  Although use of these tables was not statutorily mandated, they were provided as an administrative necessity, and their general use was approved by the courts.  Simpson v. United States, 252 U.S. 547, 550-551 (1920); Estate of Fabric v. Commissioner, 83 T.C. 932, 941 (1984).  As a result, these administrative actuarial tables were regularly applied in valuing contingent property interests given that they "afford a reasonable norm and some degree of certainty in ascertaining the value of property and the consequent tax liabilities of beneficiaries thereof."  Miami Beach First Natl. Bank v. United States, 443 F.2d 116, 119 (5th Cir. 1971).  Indeed, as the U.S. Court of Appeals for the Ninth Circuit noted in Estate of Christ v. Commissioner, 480 F.2d 171, 172-173 (9th Cir. 1973) (quoting Hanley v. United States, 105 Ct. Cl. 638, 63 F. Supp. 73, 80 (1945)), affg. 54 T.C. 493 (1970), the Commissioner's administrative tables were to be used unless their use would produce "'a result substantially at variance with the facts.'"

annuity agreement was allegedly signed by both decedent and her grandchildren, rather than on the agreement's stated entry date of August 29, 1989.

Respondent, on the other hand, contends that the private annuity is to be valued under section 7520, because the transaction occurred on August 29, 1989. Respondent points out that the grandchildren's signatures to the annuity agreement are stated to have been notarized before Mr. Shadle (a notary and decedent's attorney) on August 29, 1989. According to respondent, the testimony petitioner offered concerning the grandchildren's alleged late 1988 execution of the annuity agreement is not credible and should not be accepted by the Court in light of the convincing other evidence of record. We essentially agree with respondent.

The record reflects that although decedent signed the annuity agreement in late 1988, she retained title to and was the owner of the land until August 29, 1989. Indeed, during his testimony, Mr. Shadle acknowledged that he had drafted the annuity agreement and had written in by hand the August 29, 1989, entry date specified in the contract document. Certainly by late 1988, decedent had already decided to sell her land to her grandchildren pursuant to the planned private annuity transaction, and she and her advisers were engaged in preparing to make the sale. However, even if we were to accept (which we

do not) petitioner's offered testimony concerning the
grandchildren's alleged signing of the annuity agreement in late
1988, there would only, at best, have been an executory agreement
on decedent's part to transfer her land to them. An executory
agreement to sell is not a sale. See Armstrong v. Commissioner,
6 T.C. 1166, 1173-1174 (1946), affd. per curiam 162 F.2d 199 (3d
Cir. 1947). Moreover, petitioner's own petition asserted that
the transaction occurred on or about August 29, 1989, not in late
1988, as petitioner now contends. We hold that decedent's
transfer of the land in connection with the private annuity
transaction occurred on August 29, 1989, after the effective date
of section 7520.[5] See sec. 25.2511-2, Gift Tax Regs. (providing
that for gift tax purposes a gift is made on the date upon which

---

[5] We would note that if the transaction had taken place in
late 1988, as petitioner contends, the annuity then should have
been valued under the applicable estate and gift tax regulations
in effect for transfers made after Nov. 30, 1983, but before May
1, 1989. See T.D. 7955, 1984-1 C.B. 40; sec. 20.2031-7A(d)(6)
(Table A), Estate Tax Regs.; sec. 25.2512-5A(d)(1)(i) and (ii),
(2)(i), (6), Gift Tax Regs. If decedent's accountant had valued
decedent's annuity pursuant to the pertinent actuarial table (see
Table A in sec. 20.2031-7A(d)(6), Estate Tax Regs.) provided
under the regulations in effect in late 1988, then he presumably
would have computed a value for the annuity of at most
$1,305,866.20 ($311,165 multiplied by 4.1967). That
$1,305,866.20 value is even lower than the $1,360,724 value
respondent has computed for the annuity, pursuant to sec. 7520,
in the Mar. 13, 1996, notice of deficiency. Further, decedent's
tax advisers should have been aware of the estate and gift tax
regulations in effect in 1988, as those regulations (including
Table A) were originally issued in 1984, well before the time
when decedent and they were planning the annuity transaction.
See T.D. 7955, 1984-1 C.B. at 41, 86-87.

the gift is complete); see also sec. 25.7520-1(b)(1)(ii), Gift Tax Regs.

With respect to the value of the four parcels decedent transferred, petitioner contends that the land had a fair market value of $1,865,500, whereas respondent contends the land's fair market value was $1,945,925. No expert testimony was offered by the parties. Respondent relies heavily upon the appraisal report that petitioner obtained and provided to the estate tax examiner. In that appraisal report, the real estate appraiser concluded that the fair market value of decedent's land was $1,945,925, as of August 29, 1989. Jerry, however, testified that the land was worth only $1,865,500, as two of the parcels were worth somewhat less than the real estate appraiser had estimated. Jerry explained that the appraiser had failed to take into account (1) the significant portions of sand on these two parcels and (2) the thinner topsoil layers making them less suitable for certain crops. We found Jerry's testimony to be credible, as he was familiar with decedent's land, had considerable experience in farming, and was knowledgeable about farmland prices in the Wellton, Arizona, area. In addition, we would note that the appraisal report, though prepared by a qualified real estate appraiser, was expressly stated to be only a "preliminary valuation" of the four parcels. We hold that decedent's land had a fair market value of $1,865,500, as of August 29, 1989.

With respect to the private annuity, petitioner contends that the annuity, as of August 29, 1989, had a value of $1,865,500, and that the accountant hired to determine the annual payment decedent was to receive employed a "reasonable and proper" procedure in valuing the annuity at $1,865,500. Petitioner maintains that respondent's $1,360,724 valuation of the annuity is somehow suspect and that the valuation methodology respondent employed is not, in fact, required by section 7520 and the regulations thereunder. We disagree.

Following the enactment of section 7520 on November 10, 1988, the IRS published temporary guidance to taxpayers for transfers occurring after April 30, 1989, that would be subject to section 7520. Notice 89-24, 1989-1 C.B. 660, published on March 6, 1989, sets forth the formulas for computing the present value of an annuity on the basis of the appropriate applicable Federal midterm rate and the prior mortality experience. Notice 89-60, 1989-1 C.B. 700, published on May 30, 1989, provides tables of actuarial factors to be used in determining the present value of an annuity on the basis of more recent mortality experience. Although final regulations under section 7520 were not promulgated until June 10, 1994, the regulations eventually issued provide certain transitional rules which were made retroactive to May 1, 1989. Under these transitional rules, where the valuation date is after April 30, 1989, and before June

10, 1994, executors or donors can rely on Notice 89-24, supra, or Notice 89-60, supra, in valuing the transferred interest.  Sec. 20.7520-4, Estate Tax Regs.; sec. 25.7520-4, Gift Tax Regs.

Thus, contrary to petitioner's argument, the valuation methodology respondent employed is specifically required by the transitional rules provided in section 25.7520-4, Gift Tax Regs. Applying Notice 89-24, supra, and Notice 89-60, supra, respondent, in the notice of deficiency dated March 13, 1996, determined that the private annuity decedent received had a value of $1,360,724.

In addition, the record discloses that decedent's accountant did not reasonably value the annuity decedent was to receive. The accountant did not follow the procedure specified in Notice 89-24, supra, and Notice 89-60, supra, as he testified that he had been unaware of the enactment of section 7520.  Moreover, he did not even value the annuity pursuant to the actuarial table prescribed under the estate and gift tax regulations in effect in late 1988, which were issued in 1984.  See  supra note 5.  He used an interest rate of 9 percent (which he believed was a rate slightly higher than the then prevailing interest rate charged on land sales contracts in Arizona), notwithstanding that the actuarial tables contained in the estate and gift tax regulations then in effect (in late 1988 when decedent's accountant apparently valued the annuity) used an interest rate factor of 10

percent.  See H. Conf. Rept. 100-1104 (Vol. II), at 112 (1988), 1988-3 C.B. 473, 602.  Thus, the 9-percent interest rate the accountant used was not a reasonable interest rate, as a higher rate should have been used to reflect the private annuity's unsecured nature.  Unlike a seller under a land sale contract,[6] decedent under the private annuity would have only an unsecured right to receive a specified annual payment during her life.

We hold that the private annuity decedent received had a value of $1,360,724 as of August 29, 1989.  Sec. 7520; sec. 25.7520-4, Gift Tax Regs.; Notice 89-60, supra; Notice 89-24, supra.[7]  Thus, the $1,865,500 worth of land decedent transferred

---

[6]  In general, in an installment land sale contract, the seller retains record title to the real property but agrees to give the buyer immediate possession and to issue later to the buyer a deed to the property upon the buyer's full payment of the purchase price.  See Ariz. Rev. Stat. Ann. secs. 33-741 to 33-749 (West 1990); see also Maciborski v. Chase Serv. Corp., 161 Ariz. 557, 779 P.2d 1296, 1298-1299 (Ariz. Ct. App. 1989).

[7]  As indicated above, respondent's $1,360,724 valuation of the annuity is in accordance with the mandated standards of sec. 7520; that is, in valuing the annuity, respondent employed (1) an interest rate based on the applicable Federal midterm rate and (2) a mortality component based on more recent U.S. census data. We would note that even under the pre-sec. 7520 case law, to justify a departure from respondent's administrative actuarial tables, petitioner would have had to offer, among other things, convincing expert actuarial testimony establishing respondent's table to be old or outmoded.  See Estate of Christ v. Commissioner, 480 F.2d at 174.  Petitioner offered no such expert testimony at trial.  Even if petitioner had offered evidence attempting to do so, respondent's interest rate and mortality assumptions here (which are those prescribed by sec. 7520) can hardly be considered old or outmoded.

to her grandchildren substantially exceeded the $1,360,724 value of the annuity.

Petitioner, nevertheless, asserts that decedent's transfer of the land is not subject to gift tax, because the transaction qualifies as a sale in the ordinary course of business under section 25.2512-8, Gift Tax Regs. We disagree.

Transactions between family members are subject to special scrutiny. Harwood v. Commissioner, 82 T.C. at 258. Also, one of the major purposes of the gift tax is to prevent an avoidance of estate tax by an inter vivos transfer of property. See Carson v. Commissioner, 641 F.2d at 866 n.6.

The record reflects that no arm's-length bargaining took place between decedent and her grandchildren. Indeed, the private annuity transaction was structured by decedent's attorney and accountant and was devised as a substitute for decedent's earlier planned testamentary disposition of her land to certain of her grandchildren.

We hold that the private annuity transaction between decedent and her grandchildren is not a transaction in the ordinary course of business within the meaning of section 25.2512-8, Gift Tax Regs. See Harwood v. Commissioner, supra at 257-258.

In conclusion, decedent's August 1989 sale of her farmland to her grandchildren is subject to gift tax, as the value of the

land exceeded the value of the private annuity she received.
Commissioner v. Wemyss, 324 U.S. at 306-307; sec. 25.2512-8, Gift
Tax Regs.  In addition, in computing petitioner's estate tax
liability under section 2001, adjusted taxable gifts must be
increased to reflect decedent's August 1989 gift to her
grandchildren.

To reflect the foregoing and the parties' concessions,

Decision will be entered
under Rule 155.