116 T.C. No. 12


UNITED STATES TAX COURT



ESTATE OF PAUL C. GRIBAUSKAS, DECEASED,
ROY L. GRIBAUSKAS AND CAROL BEAUPARLANT,
CO-EXECUTORS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3107-98.                        Filed March 8, 2001.


        In late 1992, D and his former spouse won a
Connecticut LOTTO prize payable in 20 annual
installments.  At the time of his death in 1994, D was
entitled to receive 18 further annual payments of
$395,182.67 each.

        Held:  The lottery payments must be included in
D's gross estate and valued for estate tax purposes
through application of the actuarial tables prescribed
under sec. 7520, I.R.C.



Michael J. Kopsick and William J. Dakin, for petitioner.

Carmino J. Santaniello, for respondent.

## OPINION

NIMS, <u>Judge</u>: Respondent determined a Federal estate tax deficiency in the amount of $403,167 for the estate of Paul C. Gribauskas (the estate). The sole issue for decision is whether an interest held at his death by Paul C. Gribauskas (decedent), in 18 annual installments of a lottery prize, must be valued for estate tax purposes through application of the actuarial tables prescribed under section 7520.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### Background

This case was submitted fully stipulated pursuant to Rule 122, and the facts are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. Decedent was a resident of West Simsbury, Connecticut, when he died intestate in that State on June 4, 1994. His estate has since been administered by the probate court for the District of Simsbury. Roy L. Gribauskas and Carol Beauparlant, decedent's siblings, are named co-executors of his estate. At the time the petition in this case was filed, Roy Gribauskas resided in Southington, Connecticut, and Carol Beauparlant resided in Berlin, Connecticut.

The Connecticut LOTTO

In September of 1983, the State of Connecticut (the State) commenced running a biweekly "LOTTO" drawing. During all relevant periods, this lottery was administered by the State of Connecticut Revenue Services, Division of Special Revenue (the Division), in accordance with regulations promulgated to govern the game's operation. Individuals participate in the lottery by purchasing for $1.00 a ticket on which they select six numbers. If the six numbers so chosen match those randomly selected at the next LOTTO drawing, the ticketholder becomes entitled to a prize of $1,000,000 minimum, with a potentially greater award available if ticket purchases have increased the size of the jackpot. LOTTO prizes in excess of $1,000,000 are paid in 20 equal annual installments, each made by means of a check from the State payable to the prizewinner and drawn on funds in the custody of the State Treasurer. Winners are not entitled to elect payment in the form of a lump sum. As in effect during the year of decedent's death, the following administrative regulations prohibited a LOTTO prizewinner from assigning or accelerating payment of the installments:

> (d) Prizes non-assignable. A prize to which a purchaser may become entitled shall not be assignable.

> (e) Payments not accelerated. Under no circumstances, including the death of a prize winner, shall installment payments of prize money be accelerated. In all cases such payments shall continue as specified in the official procedures. The division shall make such payments payable

to the fiduciary of the decedent prize winners'[sic] estate upon receipt of an appropriate probate court order appointing such fiduciary. The division shall be relieved of any further responsibility or liability upon payment of such installment prize payments to the fiduciary of the estate of a deceased installment prize winner or the heirs or beneficiaries thereof named in an appropriate probate court order. [Conn. Agencies Regs. sec. 12-568-5(d) and (e) (1993).]

The Division was authorized to, and did, fund its LOTTO obligations through the periodic purchase of commercial annuities. The Division was named as owner of these contracts, and all payments made thereunder were remitted to the State. No specific prizewinner was either a party to or a named beneficiary of the annuity contracts. The record does not reflect the cost of these contracts, presumably because the State typically acquired a combined annuity to provide for payment of all LOTTO prizes won during a specified period of time. Additionally, payment of awards to lottery winners was not guaranteed by any State agency. However, at no time through the submission of this case had the State ever defaulted on amounts due to the approximately 2,000 persons who had won LOTTO jackpots since the game's inception in 1983.

Decedent's LOTTO Prize

In late 1992, decedent and his wife won a Connecticut LOTTO prize in the amount of $15,807,306.60. The award was payable in 20 annual installments of $790,365.34 each, commencing on December 3, 1992. After receipt of the first such installment,

decedent and his wife were divorced.  In conjunction with the ensuing settlement and division of the property rights of the couple, each spouse was to receive one-half of the remaining lottery installment payments.  Accordingly, $395,182.67, less applicable Federal and State withholding taxes, was remitted to each on December 3, 1993.  Thereafter, on June 4, 1994, decedent died unexpectedly while still entitled to 18 further annual payments of $395,182.67 each.  Since obtaining an appropriate court order as required by the Connecticut LOTTO regulations, these installments have been remitted yearly to the estate.

The Estate Tax Return

A United States Estate (and Generation-Skipping Transfer) Tax Return, Form 706, was timely filed with respect to decedent's estate on September 11, 1995.  Therein, the estate elected to report the value of assets as of the December 3, 1994, alternate valuation date.  Decedent's interest in the lottery installments was characterized on the return as an "Unsecured debt obligation due from the State of Connecticut arising from winning the Connecticut Lottery" and was included in the gross estate at the alleged present value of $2,603,661.02.  Respondent subsequently determined that the present value of the payments should have been reported as $3,528,058.22 in accordance with the annuity tables prescribed under section 7520, resulting in the $403,167 deficiency in estate tax that is the subject of this proceeding.

## Discussion

### I. General Rules

As a general rule, the Internal Revenue Code imposes a Federal tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a). Such taxable estate, in turn, is defined as the "value of the gross estate", less applicable deductions. Sec. 2051. Section 2031(a) then specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2045.

Section 2033 broadly states that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets. Among these specific sections is section 2039, which reads as follows:

SEC. 2039. ANNUITIES.

(a) General.--The gross estate shall include the value of an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the decedent), if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death.

(b) Amount Includible.--Subsection (a) shall apply to only such part of the value of the annuity or other payment receivable under such contract or agreement as is proportionate to that part of the purchase price therefor contributed by the decedent. For purposes of this section, any contribution by the decedent's employer or former employer to the purchase price of such contract or agreement * * * shall be considered to be contributed by the decedent if made by reason of his employment.

An interest included in the gross estate pursuant to one of the above-referenced provisions must then be valued. As to this endeavor, the general rule is set forth in section 20.2031-1(b), Estate Tax Regs.:

The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 [now 2045 due to addition and renumbering] is its fair market value at the time of the decedents's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * *

However, section 7520, enacted as part of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 5031(a), 102 Stat. 3342, 3668, provides a specific rule for valuing enumerated forms of property interests, as follows:

SEC. 7520. VALUATION TABLES.

(a) General Rule.--For purposes of this title, the value of any annuity, any interest for life or a term of years, or any remainder or reversionary interest shall be determined--

(1) under tables prescribed by the Secretary, and

(2) by using an interest rate (rounded to the nearest 2/10ths of 1 percent) equal to 120 percent of the Federal midterm rate in effect under section 1274(d)(1) for the month in which the valuation date falls. * * *

(b) Section Not To Apply for Certain Purposes.-- This section shall not apply for purposes of part I of subchapter D of chapter 1 [relating to qualified plans for deferred compensation] or any other provision specified in regulations.

For transfer tax purposes, regulations promulgated under section 7520 provide that the relevant actuarial tables for valuing interests covered by the statute are contained in section 20.2031-7, Estate Tax Regs. See sec. 20.7520-1(a)(1), Estate Tax Regs.; sec. 25.7520-1(a)(1), Gift Tax Regs.; see also sec. 20.2031-7T(d)(5), Example (4), Temporary Estate Tax Regs., 64 Fed. Reg. 23187, 23214 (Apr. 30, 1999) (with effective date May 1, 1999, but illustrating the calculation for valuing an annuity of $10,000 per year payable to a decedent or the decedent's estate).

The regulations also delineate exceptions to the mandatory use of the tables. In the estate tax context, paragraph (a) of section 20.7520-3, Estate Tax Regs., lists exceptions effective as of May 1, 1989, while paragraph (b) gives additional limitations effective with respect to estates of decedents dying

after December 13, 1995. See sec. 20.7520-3(c), Estate Tax Regs. These exceptions, where pertinent, will be discussed in greater detail below.

II. Contentions of the Parties

The fundamental disagreement between the parties concerns whether the stream of lottery payments constitutes an annuity which must be valued pursuant to the actuarial tables prescribed under section 7520.

The estate concedes that the prize's value is properly included in calculating decedent's gross estate under the general rule of section 2033, as "an unsecured debt obligation" in which decedent had an interest at death. However, the estate denies that the payments are similarly includible as an annuity under section 2039. According to the estate, the lottery prize fails to meet the specific requirements set forth in section 2039(a) for classification as an annuity under that section. Moreover, even if such criteria were deemed satisfied, the estate maintains that operation of section 2039(b) would result in including only that portion of the asset equal to the $1.00 purchase price, a de minimis amount.

From these propositions, and to a significant degree apparently equating the term "annuity" in section 2039 with use of the word in section 7520, the estate argues that the LOTTO payments need not be valued under the prescribed actuarial

tables.  Rather, it is the estate's position that the broader willing-buyer, willing-seller standard should control, with factors such as lack of marketability taken into account in discounting the prize to present value.

In the alternative, the estate contends that even if the lottery award is held includible in decedent's gross estate as an annuity under section 2039, deviation from the prescribed tables is warranted in this case.  The estate claims that the tables may be disregarded when their use would produce an unreasonable result and that, due to restrictions on the asset in question, such a situation is present here.

Conversely, respondent asserts that decedent's right to 18 fixed annual payments constitutes an annuity which must be valued pursuant to section 7520.  With respect to section 2039, respondent maintains that the lottery installments satisfy all elements for inclusion in the gross estate under subsection (a) and that no grounds are provided in subsection (b) for limiting such inclusion.  However, regardless of the specific applicability of section 2039, it is respondent's position that the LOTTO prize is an interest to which section 7520 applies. Respondent avers that the statute cited for inclusion in the gross estate is not dispositive of whether tabular valuation is mandated.  Rather, it is the nature of the payment stream at issue that controls, and respondent contends that the periodic

installments here exhibit characteristics consistent with rights properly valued under the section 7520 tables.  Moreover, respondent alleges that neither any general regulatory exceptions nor particular features such as lack of marketability permit departure from the tables in the circumstances of this case.

Hence, in essence the parties agree that the value of the lottery installments is to be included in decedent's gross estate and that the appropriate methodology for ascertaining such value is to discount the stream of payments to present value.  They advance opposing theories, however, for arriving at the relevant discount rate.  Section 7520 mandates use of a 9.4-percent discount rate for annuities valued as of December 3, 1994, and respondent contends that this statute is applicable to the facts before us.  In contrast, the estate argues that the discount rate should be determined by consideration of what a willing buyer would pay a willing seller for the asset at issue and, further, apparently finds that a discount rate of approximately 15 percent, adjusting for risk, inalienability, illiquidity, and lack of marketability, is proper here.  Lastly, we note that for purposes of disposing of the legal issues raised by this proceeding, the parties have stipulated that if the Court determines departure from the annuity tables is warranted, the

value of the lottery installment payments as of the alternate valuation date will be deemed to be the $2,603,661.02 claimed in the estate tax return.

III.  Analysis

    A.  Relevance of Section 2039

    As a threshold matter, this case presents a preliminary question regarding the relationship among sections 2033, 2039, and 7520.  Specifically, is finding that an interest fails to meet the criteria for inclusion in the gross estate as an annuity under section 2039, and is so included only under section 2033, determinative of whether the interest is an annuity within the meaning of section 7520?  We answer this inquiry in the negative for the reasons detailed below.

    The purpose of section 2039, by its terms, is to effect inclusion in the gross estate of annuity or payment rights meeting certain enumerated criteria.  At the same time, regulations promulgated under the statute indicate that section 2039 does not provide the exclusive definition of interests which may be considered an annuity for purposes of the Internal Revenue Code.  Section 20.2039-1(a), Estate Tax Regs., recites the following:  "The fact that an annuity or other payment is not includible in a decedent's gross estate under section 2039(a) and (b) does not mean that it is not includible under some other section of part III of subchapter A of chapter 11 [comprising

sections 2031 through 2046]."  The inference to be drawn from this statement is that certain interests properly characterized as an "annuity" within the meaning of the estate tax laws may not fall within the purview of section 2039.

This inference is further supported by consideration of the rationale underlying enactment of section 2039.  It has been recognized that "Congress intended to include in the gross estate of a decedent for estate tax purposes the value of interests which under traditional common law concepts were never part of the 'estate.'"  Gray v. United States, 410 F.2d 1094, 1097 (3d Cir. 1969).  Yet an annuity payable to a decedent's estate would have been considered an estate asset and subject to probate. Additionally, examples contained in both the legislative history and the current regulations reveal a focus on nonprobate assets such as annuities payable to a designated surviving beneficiary, joint and survivor annuities, and employer-provided retirement annuities payable to a named beneficiary.  See S. Rept. 1622, 83d Cong., 2d Sess. (1954); H. Rept. 1337, 83d Cong., 2d Sess. (1954); sec. 20.2039-1, Estate Tax Regs.  It therefore would seem reasonable to conclude that section 2039 did not and does not purport to cover the universe of potential annuities that may be subject to inclusion and valuation for estate tax purposes.

Case law also comports with this interpretation.  For instance, in Arrington v. United States, 34 Fed. Cl. 144, 145-146

(1995), affd. without published opinion 108 F.3d 1393 (Fed. Cir. 1997), the court described the interest at issue in that case, a stream of payments to be received by the decedent's estate under a lawsuit settlement agreement, as follows:

> This settlement agreement also provided for the funding of an annuity "for the sole use and benefit of WILLIAM ARRINGTON."  Specifically, the annuity would be for
>> the sum of Two Thousand Twenty Seven and 86/100 ($2,027.86) Dollars per month beginning on January 7, 1990 for the remainder of WILLIAM ARRINGTON's life, guaranteed for a minimum of three hundred and sixty (360) months.  In the event of WILLIAM ARRINGTON's death prior to the expiration of three hundred and sixty (360) months, the remaining monthly payments in the guaranteed period shall continue to be paid as they fall due on a monthly basis to the estate of WILLIAM ARRINGTON and not in a lump sum.

The court then went on to hold the installments includible in the decedent's gross estate under section 2033 on the grounds that the decedent was "the beneficial owner of the annuity".  Id. at 147-148, 150.  Arrington v. United States, supra, thus illustrates that an annuity classification and a section 2033 inclusion are not mutually exclusive concepts.

Consequently, based on the foregoing authorities, we are satisfied that the particular section under which an interest might be included in the gross estate is not dispositive of the interest's status as an annuity which potentially must be valued under section 7520.  Since the estate has conceded, and we concur, that the subject lottery payments are includible under

section 2033, we find it unnecessary to probe whether the installments would also satisfy all of the specific criteria for inclusion under section 2039. Because an interest need not meet each of the particular requirements of that section to be considered an annuity, the only arguments made in connection with section 2039 that are directly relevant to the dispositive section 7520 issue are those concerning the meaning of "annuity" as a stand-alone term. Accordingly, we proceed to analysis of these contentions, and we do so in the context of section 7520's use of the word.

    B.   <u>Meaning of Annuity as Used in Section 7520</u>

We are now faced squarely with the question of what is meant by the term "annuity" in section 7520. The statute itself contains no definition beyond the phrase "any annuity, any interest for life or a term of years, or any remainder or reversionary interest". Sec. 7520(a). The regulations under section 7520, as in effect on December 3, 1994, are equally devoid of explicit guidance. Furthermore, we are aware of no cases offering a definition of the word in the context of section 7520's use thereof. In such circumstances, the general rule is

that "a statutory term should be given its normal and customary meaning." Ashland Oil, Inc. v. Commissioner, 95 T.C. 348, 356 (1990).

Black's Law Dictionary 88 (7th ed. 1999) defines annuity as "An obligation to pay a stated sum, usu. monthly or annually, to a stated recipient" and as "A fixed sum of money payable periodically". Webster's Third New International Dictionary 88 (1976) provides that an annuity is "an amount payable yearly or at other regular intervals (as quarterly) for a certain or uncertain period". We likewise pointed out in Estate of Shapiro v. Commissioner, T.C. Memo. 1993-483, that "An 'annuity' is commonly defined as a fixed, periodic payment, either for life or a term of years." Additionally, although not directly applicable here due to the December 14, 1995, effective date, we note that section 20.7520-3(b)(1)(i)(A), Estate Tax Regs., now contains the analogous statement that "An ordinary annuity interest is the right to receive a fixed dollar amount at the end of each year during one or more measuring lives or for some other defined period."

In the instant case, the estate acknowledges that the LOTTO installments are consistent with these definitions. However, the estate further maintains that such definitions, standing alone, are overinclusive, in that they focus solely on the payment

stream without taking into account the nature of the underlying

corpus or asset giving rise to the right to payments.  According

to the estate:

> An annuity is generally defined as a right to receive
> fixed, periodic payments, either for life or a term of
> years, but an annuity exists only by virtue of a corpus
> invested to produce an income stream for a specified
> term pursuant to a contract or other agreement.
> Contrary to the suggestion made by the Commissioner
> that the Stipulation of Facts regarding the source and
> reason for the payments is immaterial, any
> determination of the nature of this asset requires an
> analysis of the underlying characteristics and factors
> that create the right to those payments. * * *

The estate proceeds to offer a litany of features which

would characterize what, in the estate's estimation, would

customarily be understood as an annuity.  As described by the

estate, an annuity is purchased for a premium substantially

greater than $1.  The annual installments are then derived from

this corpus invested by or for the recipient, such that an

annuity contract provides for the liquidation of an asset.  The

amount of the installments, in turn, is a function not only of

the invested contribution but also typically of the annuitant's

age, gender, health, and the type of annuity contract purchased.

With respect to contract type, options available to the

purchaser, each with a consequent impact on benefit level,

include an immediate or a deferred benefit, a single or an annual

premium, a fixed or a variable payment, and a termination of

benefits on death or a guaranteed minimum number of installments.

In addition, an annuity contract will usually provide the owner with specific rights during the period the agreement remains in force. The contract can generally be alienated and assigned, and the owner can elect to name a beneficiary of the contract.

In contrast, the estate emphasizes that a LOTTO prize is the result of a $1 wager, not a substantial invested premium. The annual installments are derived from the income and investments of the State, not from the corpus supplied by the purchaser. The winner's age, gender, or health play no role in determining the benefit level. Additionally, the winner lacks any ability to make choices regarding payment commencement, amount, duration, or termination, and cannot assign the installments or elect a beneficiary to receive installments upon the winner's death.

Having thus attempted to demonstrate that the lottery prize does not resemble a typical annuity valued under actuarial tables, the estate then goes on to cite a variety of assets yielding payment streams which, according to the estate, are valued not under section 7520 but rather by taking into account the unique characteristics of and restrictions on the asset. The implicit invitation is that we determine that the installments here are more analogous to these alternatives and that similar, item-specific fair market principles should be used in the prize's valuation.

The estate discusses notes receivable, leasehold payments, patents, and royalties.  We recount features of these assets and their valuation as stipulated by the parties, without opining as to the validity thereof, for purposes of framing the parties' respective positions.  A note receivable represents the promise of the maker to pay the holder a definite sum of money.  Notes receivable, although exhibiting a wide array of discrete terms and conditions, generally are the product of an agreement that provides for a series of payments over a period not necessarily determined by reference to the holder's life.  Pursuant to section 20.2031-4, Estate Tax Regs., the fair market value of a note is presumed to be its unpaid principal amount plus accrued interest.  However, this presumption can be refuted by evidence that the interest rate, maturity date, collection risk, maker solvency, collateral sufficiency, or other causes warrant a lesser value.

A leasehold interest is the product of an agreement providing for a lessor to receive payment for a lessee's use of property.  Valuation of the resultant payment stream typically relies upon an income capitalization approach to discount the rental installments to present value.  Factors considered in calculating an appropriate capitalization rate include the nature of the property, the positive and negative physical attributes of

the property, the term of the lease, the market rate of rent for similar properties, and any risk factors that could affect receipt of payments.

A patent is an exclusive right to make, use, and sell a patented item.  As in the case of a leasehold, the payment stream available to the holder of a patent is valued by quantifying a variety of factors to reach an appropriate discount or capitalization rate.  Such elements include the age of the patent, its economic and legal life, the income it generates, the products with which the underlying item competes, the risks of the relevant industry, and the status of the economy.

A royalty is the income received from another for the other's use of property, and the term is usually employed in reference to mineral rights, copyrighted works, trademarks, and franchise interests.  The value of a right to royalty payments is again based upon the particular characteristics and risks associated with the payment stream, taking into account the annual income produced, the length of the agreement's term, the payment history, the possibility of sales or volume reduction with respect to the underlying asset, any pertinent governmental and industrial restrictions, and the nature of the underlying asset (including the quantity and quality of reserves for mineral and oil interests).

Thus, we have been presented, on one hand, with elements the estate believes characterize the type of asset that should be considered an annuity subject to valuation under prescribed tables and, on the other hand, with features exhibited by other assets yielding payment streams and used to derive an appropriate fair market value apart from mere reference to actuarial tables. The estate's position is that the LOTTO prize involves a unique bundle of rights and restrictions which, like those inherent in notes, leaseholds, patents, and royalties, warrants an individualized approach to valuation. Respondent, in contrast, maintains that there exist no pertinent differences between the lottery payments and other payment streams valued using the standardized tabular approach.

Taking into account the above body of information and the parties' contentions with respect thereto, we conclude that decedent's lottery winnings constitute an annuity within the meaning of section 7520. In reaching this decision, we first consider the characteristics of an annuity, both as portrayed by the estate and as reflected in case law. Second, we focus on comparing these annuity features with those of assets which the parties agree are valued other than as annuities. Third, we examine how the lottery payments fit within the framework so developed.

1.  Analysis of Annuity Characteristics

We begin with a few comments on the relevance of the estate's submissions regarding the characteristics of a typical annuity.  While we do not dispute that the features cited may be widely present in commercially purchased annuity contracts, we point out that to the extent these elements are not also representative of so-called private annuities, they offer little insight into the nature of interests intended to be treated under the section 7520 tables.

Section 7520(b) states that the section shall not apply for purposes "specified in regulations."  Section 20.7520-1, Estate Tax Regs., directs generally that annuities be valued in accordance with section 20.2031-7, Estate Tax Regs., and the tables therein.  However, section 20.2031-7(b), Estate Tax Regs., expressly excepts commercial annuities from its operation, as follows:  "The value of annuities issued by companies regularly engaged in their sale * * * is determined under § 20.2031-8."  Section 20.2031-8(a)(1), Estate Tax Regs., in turn provides that the value of such contracts "is established through the sale by that company of comparable contracts."  Since the State of Connecticut is not in the business of selling annuity contracts, we clarify that the attributes of a commercial annuity are relevant here only in so far as they parallel what would be found with respect to a private annuity.

Although there are few cases applying section 7520 to such private annuities, this Court in Estate of Cullison v. Commissioner, T.C. Memo. 1998-216, affd. without published opinion 221 F.3d 1347 (9th Cir. 2000), characterized an arrangement as a private annuity and required its valuation under section 7520.  The agreement at issue there provided that the decedent would convey all of her interest in certain farmland to her grandchildren by warranty deed and that the grandchildren would pay to her $311,165 annually for the remainder of her life. See id.  The agreement further specified that the decedent would have no further interest in the land after the date the agreement was signed and that the land would not be security for the annuity payments.  See id.

In addressing whether any portion of the land transfer constituted a gift, the estate argued that the annuity was properly valued apart from the section 7520 tables, on the basis of an interest rate supposedly reflecting that available on land sale contracts in the area.  See id.  We, however, pointed out that "Unlike a seller under a land sale contract, decedent under the private annuity would have only an unsecured right to receive a specified annual payment during her life."  Id. (fn. ref. omitted).  We then held that such an interest was within the scope of section 7520.  See id.

In addition, cases decided under law preceding section 7520's effective date offer a degree of guidance on the concept of a private annuity for transfer tax purposes. Even prior to the enactment of section 7520, estate and gift tax regulations had long contained actuarial tables for use in valuing private annuities, life estates, and terms of years. See Simpson v. United States, 252 U.S. 547, 549 (1920); Dix v. Commissioner, 46 T.C. 796, 800 (1966), affd. 392 F.2d 313 (4th Cir. 1968); Estate of Cullison v. Commissioner, supra; Estate of Shapiro v. Commissioner, T.C. Memo. 1993-483. While no statute mandated their application, courts generally approved of and often required their use. See Dix v. Commissioner, supra at 801; Estate of Shapiro v. Commissioner, supra.

For instance, in Dix v. Commissioner, supra at 798-801, we concluded that the regulatory tables were to be used in valuing a lifetime "private annuity" paid pursuant to an agreement stating as follows:

> WHEREAS, THE transferor is willing to bargain, sell, and transfer to the transferees all the securities so listed in Schedule 'A', provided however that transferees, and each of them, will agree to pay the transferor a sum certain annually, as hereinafter set forth, regardless of the value of the securities so transferred and regardless of the income therefrom received by transferees * * *

Similarly, in Estate of Shapiro v. Commissioner, supra, the will of the decedent's predeceased wife had established a trust and instructed the trustee "pay to my husband or apply for his

benefit an annuity of Three Hundred Thousand ($300,000.00) Dollars per year from my date of death during his life". We held that the bequest was "properly characterized as a lifetime annuity under section 20.2031-7(a)(2), Estate Tax Regs.", and properly valued by the tables prescribed thereunder. Id.

Given such cases, we are satisfied that the definition of annuity for purposes of section 7520 is broader than the estate suggests. Estate of Cullison v. Commissioner, supra, involved neither a payment stream derived from an invested corpus nor the liquidation of an asset. The payments in Dix v. Commissioner, supra, were equally independent of any underlying corpus. The bequest in Estate of Shapiro v. Commissioner, supra, bears little resemblance to the contractual relationship described by the estate--purchase premiums, benefit options, beneficiary elections, etc., played no role in the annuity's genesis or operation.

Moreover, the authorities discussed above also make clear that a private annuity may be nothing more or less than an unsecured debt obligation. Consequently, the estate's repeated labeling of the LOTTO prize as such in no way disqualifies it from annuity status. That said, we turn to those assets that the parties have agreed are in fact not considered annuities for valuation purposes.

2.  Comparison of Nonannuity and Annuity Characteristics

In seeking to ascertain what might distinguish notes receivable, leasehold payments, patent rights, and royalties from the annuities previously examined, we look first at notes receivable.  Furthermore, our review thereof convinces us that these assets differ from annuities in a fundamental respect.  It is the concept of interest which renders valuation of a note a very different enterprise from valuation of an annuity.  Because an annuity involves a series of fixed payments which bear no interest, it is actuarially valued by discounting the stream to present value.  The purpose of doing so is to account for the time value of money.  In contrast, because the vast majority of notes are interest-bearing, no such calculation is required.  The issue of time value is addressed by charging interest on the face amount, such that the outstanding principal typically corresponds to the present value without need for further manipulation.  This idea, in turn, provides the rationale which supports the rule set forth in section 20.2031-4, Estate Tax Regs., presuming a value equal to the unpaid principal amount and listing the interest rate (or, implicitly, lack of a market rate of interest) as a potential basis for deviation.  A similar approach presuming a value equal to the "face" dollar amount of annuity installments could not reasonably be suggested.

As regards leasehold, patent, and royalty payments, each of these assets, unlike an annuity, derives from the use of an underlying item of tangible or intangible property that exists separate and apart from the agreement to make a series of remittances.  Consequently, the anticipated payment stream can be affected by a wide variety of external market forces that operate on and impact the worth of the underlying asset.  This injects into the valuation of these payment streams risks and considerations beyond simply the time value of money.

Hence, our review of a sample of nonannuity assets leads us to conclude that the common definition of an annuity is sound.  A promise to make a series of fixed payments, without more, may generally be classified as an annuity.  Conversely, if the agreement is tied to something further, such as an independent underlying asset or an interest rate, a different characterization may well be more appropriate.  With this framework in mind, we next focus specifically on decedent's lottery prize.

3.  Examination of Lottery Payments

Based on the principles formulated above, we conclude that decedent's LOTTO winnings are properly characterized for tax purposes as an annuity.  As the estate acknowledges, the asset at issue here derives solely from the State's promise to make a series of fixed payments.  The right to installments is not

dependent on any particular underlying asset, is not subject to alteration as a result of external market forces, and does not bear interest. Accordingly, while we see features which distinguish the payment streams generated by each of the nonannuity assets brought to our attention from the private annuities reflected in case law, we find no such characteristics weighing upon decedent's right to the lottery installments.

Moreover, in probing what attributes might differentiate some other form of payment from an annuity, we note a conspicuous absence. The cases discussed above which declare certain payment arrangements to be a private annuity never address the contractual options available to the payee for taking advantage of his or her right to the installments. Whether this right may be transferred or assigned are elements which fail to enter into the courts' calculus. Likewise, of the stipulated factors that apparently render note, leasehold, patent, and royalty payments unique and individually valued, none reflects any concern with the payee's ability to manipulate the right to receive installments. Additionally, because the estate so emphasizes the concept of marketability, we observe as a parallel that the parties provided by stipulation that notes come in a wide variety of types including, among other things, nonassignable. Yet no one could contend that lack of assignability converts a note into some other form of asset. Hence, we are satisfied that such

issues are largely subsidiary to determining the basic characterization, in the first instance, of a payment right. Whether these features affect the value in a particular case of an asset so classified is a question which we shall take up below. At this juncture, we first hold that decedent's lottery winnings constitute an annuity for tax purposes and within the meaning of section 7520.

C. Valuation of Lottery Installments Under Section 7520

Interests within the purview of section 7520 must be valued in accordance with the prescribed actuarial tables unless they can satisfy the requisites for an exception to the statute's use. As previously indicated, section 20.7520-3(a), Estate Tax Regs., provides a list of exceptions effective May 1, 1989, none of which has been cited as on point here, and section 20.7520-3(b), Estate Tax Regs., enumerates additional exceptions effective after December 13, 1995. See sec. 20.7520-3(c), Estate Tax Regs. While these latter limitations are not directly applicable to 1994, the preamble to T.D. 8630, 1996-1 C.B. 339, which adopted paragraph (b) as an amendment to the final regulations under section 7520, addressed the relationship of the new provisions to prior law as follows:

> One commentator suggested that the tables prescribed by the regulations must be used for valuing all interests transferred between April 30, 1989 (the effective date of section 7520) and December 13, 1995 (the effective date of the regulations). However, these regulations generally adopt principles

established in case law and published IRS positions.
* * * There is no indication that Congress intended to
supersede this well-established case law and
administrative ruling position when it enacted section
7520.  Consequently, in the case of transfers prior to
the effective date of these regulations, the question
of whether a particular interest must be valued based
on the tables will be resolved based on applicable case
law and revenue rulings.

Accordingly, the estate references both case law and section

20.7520-3(b)(1)(ii), Estate Tax Regs., to establish that

decedent's lottery winnings, even if considered an annuity under

section 7520, need not be valued by means of the prescribed

tables.

At the time section 7520 was enacted, this and other courts

had long accepted as a general rule that interests covered by

then-existing regulatory tables were to be valued thereunder

"'unless it is shown that the result is so unrealistic and

unreasonable that either some modification in the prescribed

method should be made * * * or complete departure from the method

should be taken, and a more reasonable and realistic means of

determining value is available.'"  Vernon v. Commissioner, 66

T.C. 484, 489 (1976) (quoting Weller v. Commissioner, 38 T.C.

790, 803 (1962)); see also Berzon v. Commissioner, 534 F.2d 528,

531-532 (2d Cir. 1976), affg. 63 T.C. 601 (1975); Continental

Ill. Natl. Bank & Trust Co. v. United States, 504 F.2d 586, 594

(7th Cir. 1974); Froh v. Commissioner, 100 T.C. 1, 3-4 (1993),

affd. without published opinion 46 F.3d 1141 (9th Cir. 1995);

Estate of Christ v. Commissioner, 54 T.C. 493, 535-537 (1970), affd. 480 F.2d 171 (9th Cir. 1973).  It was equally well recognized that the burden of proving that this standard was met rested on the party seeking to deviate from the tables.  See Bank of Calif. v. United States, 672 F.2d 758, 759 (9th Cir. 1982); Vernon v. Commissioner, supra at 489; Estate of Christ v. Commissioner, supra at 535.

In the instant case, the estate maintains that the annuity tables yield an unrealistic and unreasonable result for the decedent's winnings on the grounds that "tabular valuation fails to consider (1) the unsecured nature of the LOTTO prize obligation, (2) the lack of a corpus from which to draw upon, and (3) the inability to assign, sell or transfer the interest."  The estate asserts that the nearly $925,000 difference between an appraised value which purportedly takes these features into account and the section 7520 value shows failure by the tables to produce a realistic result.  Respondent's position, on the other hand, is that case law authorizes departure from the tables only where one or more of the "assumptions on which the tables are based, namely probability of survival of the measuring life, assumed rate of return, or assumed continuous availability of the source of funds for payment of the interest" differ significantly

from the actual facts presented.  Respondent further emphasizes that a quantitative comparison of values obtained under different approaches is no basis for deviation.

As a preliminary matter in our assessment of the parties' contentions, we reiterate a point made earlier.  Precedent and logic clearly establish that a private annuity, for purposes of the tables, may be both unsecured and independent of any particular corpus.  See Dix v. Commissioner, 46 T.C. 796, 798, 800-801 (1966); Estate of Cullison v. Commissioner, T.C. Memo. 1998-216.  Hence, our analysis here will focus on whether the third of the estate's alleged reasons for departure from the tables, the lack of marketability, supports such a deviation.

A review of the cases addressing attempts to avoid use of the tables reveals that those permitting departure have almost invariably, with an exception to be discussed below, required a factual showing that renders unrealistic and unreasonable the return or mortality assumptions underlying the tables.  In general, it has been recognized that expert actuarial testimony establishing the Commissioner's tables to be old or outmoded may be cause for deviation.  See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Dunigan v. United States, 434 F.2d 892, 895-896 (5th Cir. 1970); Estate of Cullison v. Commissioner, supra.  As specifically regards return, rights to income from assets shown to be

nonincome producing, see Maryland Natl. Bank v. United States, 609 F.2d 1078, 1081 (4th Cir. 1979); Berzon v. Commissioner, supra at 531-532; Stark v. United States, 477 F.2d 131, 132-133 (8th Cir. 1973), or to be subject to depletion prior to expiration of the term interest, see Froh v. Commissioner, supra at 5, have been held properly valued apart from the tables.  In contrast, where known facts failed to establish a basis for concluding that a previous average rate of return would remain constant into the future, even a marked difference between past experience and the prescribed rate has not justified an alternate methodology.  See Vernon v. Commissioner, supra at 490; Estate of Christ v. Commissioner, 54 T.C. at 537-542.  With respect to mortality, a known fatal condition leading to imminent death has been ruled to make use of actuarial tables unreasonable.  See Estate of Butler v. Commissioner, 18 T.C. 914, 919-920 (1952); Estate of Jennings v. Commissioner, 10 T.C. 323, 327-328 (1948); cf. Bank of Calif. v. United States, supra at 760; Continental Ill. Natl. Bank & Trust Co. v. United States, supra at 593-594.

At the same time, the courts repeatedly have emphasized the limited nature of these exceptions and the important role played by the actuarial tables.  See Bank of Calif. v. United States, supra at 760; Continental Ill. Natl. Bank & Trust Co. v. United States, supra at 593-594.  In the words of the Court of Appeals for the Ninth Circuit: "actuarial tables provide a needed degree

of certainty and administrative convenience in ascertaining
property values and prove accurate when applied in large numbers
of cases, although discrepancies inevitably arise in individual
cases." Bank of Calif. v. United States, supra at 760. There is
also, in these cases specifically dealing with the standard for
departure, once again a salient absence of any consideration
regarding what rights the payee may have had to liquidate or
dispose of his or her interest. In fact, the income right at
issue in Estate of Christ v. Commissioner, 54 T.C. at 499, 542,
which was held subject to valuation under the tables of section
20.2031-7, Estate Tax Regs., was expressly made nonassignable.
The trust instrument provided:

> The beneficiaries of this trust are hereby
> restrained from selling, transferring, anticipating,
> assigning, hypothecating or otherwise disposing of
> their respective interests in the corpus of the said
> trust, or any part thereof, and of their respective
> interests in the income to be derived and to accrue
> therefrom, or any part thereof, at any time before the
> said corpus or the said income shall come into their
> possession under the terms of said trust * * * [Id. at
> 499.]

Yet no deviation was permitted. See id. at 537, 542.

Moreover, it is noteworthy that other forms of annuity which
lack liquidity are expressly required by statutes and regulations
to be valued under the Commissioner's prescribed tables. For
instance, in the context of a grantor-retained annuity trust,
section 2702(a)(2)(B) mandates valuation of a qualified retained
annuity interest under section 7520. Nonetheless, in order to

create such a qualified interest, the trust instrument must prohibit both (1) distributions from the trust to or for the benefit of any person other than the annuitant during the term of the interest and (2) commutation (prepayment) of the annuity interest. See sec. 25.2702-3(d)(2), (4), Gift Tax Regs. Similarly, the present value of the annuity portion of a charitable remainder annuity trust is computed under section 20.2031-7(d), Estate Tax Regs., notwithstanding that the trust may not be altered to provide for payment to or for the benefit of any noncharitable beneficiary other than the person or persons named in the governing instrument. See sec. 1.664-2(a)(1)(i), (a)(4), (c), Income Tax Regs. Hence, we find statutory and regulatory support for the premise that lack of liquidity or marketability is not taken into account in determining whether tabular valuation is appropriate.

Given the foregoing precedent, we are convinced that there exists no authority for the anomalous position taken by the U.S. District Court for the Eastern District of California in Estate of Shackleford v. United States, 84 AFTR 2d 99-5902, 99-2 USTC par. 60,356 (E.D. Cal. 1999). Estate of Shackleford v. United States, supra, involved facts nearly identical to those now before this Court. Mr. Shackleford won a California lottery prize to be paid in 20 nonassignable annual installments and then died after receiving only three payments. See id. at 99-5902 to

99-5903. On the issue of valuing these payments for estate tax purposes, the District Court accepted with little explanation that the prize was an annuity within the purview of section 7520. See id. at 99-5905 to 99-5906. However, the court concluded that departure from the actuarial tables was warranted because failure "to take into account the absolute lack of liquidity of the prize" rendered tabular valuation unreasonable. Id. at 99-5906.

We cannot agree with the District Court for several reasons. First, as indicated above, case law offers no support for considering marketability in valuing annuities. (The only other case cited by the estate for this proposition, Bamberg, Executor under the Will of McGrath v. Commissioner of Revenue, No. 132709, 1985 WL 15773 (Mass. App. Tax. Bd. Sept. 20, 1985), is a State tax case that affords no cogent analysis of the issue for Federal tax purposes.)

Second, the enactment of a statutory mandate in section 7520 reflects a strong policy in favor of standardized actuarial valuation of these interests which would be largely vitiated by the estate's advocated approach. A necessity to probe in each instance the nuances of a payee's contractual rights, when those rights neither alter or jeopardize the essential entitlement to a stream of fixed payments, would unjustifiably weaken the law.

Third, as a practical matter, we observe that an annuity, the value of which consists solely in a promised stream of fixed payments, is distinct in nature from those interests to which a marketability discount is typically applied. As the estate acknowledges, discounts for lack of marketability are most prevalent in valuation of closely held stock or fractional interests in property. Such is appropriate in that capital appreciation, which can usually be accessed only through disposition, is a significant component of value. The value of an annuity, in contrast, exists solely in the anticipated payments, and inability to prematurely liquidate those installments does not lessen the value of an enforceable right to $X annually for X number of years.

In connection with the foregoing, we further note that any attempted comparison to the "small market of those willing to purchase unassignable lottery winnings", which the parties stipulated to exist, would be inapposite. Decedent died owning an enforceable right to a series of payments. Yet any purchaser buys only an unenforceable right and so is necessarily valuing a different species of interest. What a LOTTO prize might be worth to such a speculator hardly reflects its value in the hands of a legitimate owner. Hence, because there is no market for the precise interest held by decedent, the need for a standardized approach becomes even more apparent.

Lastly, we comment that section 20.7520-3(b)(1)(ii), Estate Tax Regs., cited by the estate, does not cause us to reach a different conclusion. Section 20.7520-3(b)(1)(ii), Estate Tax Regs., deals with an exception to section 7520 for certain restricted beneficial interests and states:

> A restricted beneficial interest is an annuity, income, remainder, or reversionary interest that is subject to any contingency, power, or other restriction, whether the restriction is provided for by the terms of the trust, will, or other governing instrument or is caused by other circumstances. In general, a standard section 7520 annuity, income, or remainder factor may not be used to value a restricted beneficial interest. * * *

The regulation then goes on to cite two examples where its provisions would be applicable, one of which involves a power to invade corpus that could diminish the income interest to be valued and the other of which addresses an annuity payment measured by the life of one with a terminal illness. See id.; sec. 20.7520-3(b)(2)(v), Example (4), Estate Tax Regs.; sec. 20.7520-3(b)(4), Example (1), Estate Tax Regs.

In light of the examples given and the previously quoted preamble of T.D. 8630, 1996-1 C.B. 339, we are satisfied that the intent of this provision was to formalize the existing case law regarding the validity of the tabular assumptions in situations where facts show a clear risk that the payee will not receive the anticipated return. Thus, a restriction within the meaning of the regulation is one which jeopardizes receipt of the payment stream, not one which merely impacts on the ability of the payee

to dispose of his or her right thereto.  We cannot realistically accede to the view that an agreement for fixed payments backed by the full faith and credit of a State government raises any such concerns.  Accordingly, even if applicable, this regulation would not aid the estate.

We therefore hold that lottery payment installments at issue here must be valued through application of the actuarial tables prescribed under section 7520.  Additional arguments by the parties, to the extent not specifically addressed herein, have been carefully considered but found unconvincing, irrelevant, or moot.

To reflect the foregoing, and to take into account any further allowable deduction under section 2053,

<u>Decision will be entered under Rule 155</u>.